**TRUE TEMPER CORPORATION, Plaintiff-Appellant and Cross-Appellee,**

v.

**CF&I STEEL CORPORATION, Defendant-Appellee and Cross-Appellant.**

**Nos. 76–2106, 76–2107.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted March 13, 1978.

Decided May 31, 1979.

J. Helen Slough, Cleveland, Ohio (Squire, Sanders & Dempsey, Cleveland, Ohio, Peter Holme and Joseph E. Meyer, III, of Holme, Roberts & Owen, Denver, Colo., of counsel, on the brief), for plaintiff-appellant and cross-appellee.

Lawrence F. Scinto, New York City (Nels T. Lippert of Fitzpatrick, Cella, Harper & Scinto, New York City, and Miles C. Cortez, Jr., of Welborn, Dufford, Cook & Brown, Denver, Colo., of counsel, on the brief), for defendant-appellee and cross-appellant.

Before HOLLOWAY, DOYLE and McKAY, Circuit Judges.

HOLLOWAY, Circuit Judge.

Plaintiff-appellant True Temper Corporation (True Temper) appeals from an adverse judgment in its suit against defendant-appellee CF&I Steel Corporation (CF&I) for infringement of its U. S. Patents Nos. 3,102,690 and 3,195,198. The '690 patent covers a one-piece rail anchor used by the railroads, and shown in Appendix A. The '198 patent covers the automated hot-forming press used to manufacture this rail anchor on a commercial basis.

The trial court held in its unreported opinion (I App. 14 *et seq.*) that both patents were invalid on grounds of full anticipation in the prior art, 35 U.S.C. § 102, and of obviousness to a person of ordinary skill in the art, 35 U.S.C. § 103. The court further held that plaintiff's inequitable conduct in prosecuting both patents before the Patent Office barred their enforcement against an alleged infringer. And the court held that, even if the patents were deemed valid and enforceable, defendant's accused devices did not infringe on plaintiff's claims thereunder. The court granted judgment dismissing plaintiff's complaint and granted injunctive and declaratory relief for defendant, adjudging plaintiff's patents invalid and not infringed. The trial judge also ruled that these were not exceptional cases warranting recovery of attorney fees by the defendant CF&I and that each party should bear its own costs.

Plaintiff True Temper appeals all the adverse rulings against it and defendant CF&I cross appeals from the denial of attorney fees and costs.

I

## A. THE GENERAL BACKGROUND OF THE PATENTS IN SUIT

Rail anchors are used in the railroad industry to prevent longitudinal movement of railroad rails during passage thereover by rolling stock, which naturally exerts great pressures on the rails. The anchors, which are manufactured by several different companies and come in several forms, are attached to the bottom flange of a rail at a point adjacent to and on either side of a railroad tie. By gripping the base of the rail firmly, and bearing up against the tie (though not actually being fastened to it), the anchor transmits the longitudinal force of the railroad load from the rail to the tie and restrains any forward movement of the rail itself.

There are two main types of rail anchors. The "spring" type is made of heavy bar section iron with a hook at one end (for grasping the rail flange), being bent along its length in a variety of "dips" to achieve tie-bearing area (the exact configuration depending on the manufacturer), and culminating in a "latching" piece to grip the rail at the opposite end. Such an anchor "is held on the rail by a spring force that is exerted between the two outside edges of the base." (I App. 55). The "jaw" type anchor, before plaintiff's '690 patent, was generally made of bar or T-section iron, having a deep jaw at one end to hold onto the rail flange; a relatively flat, unbent central section running under the rail;[1] and a small vertical face at the opposite end to latch onto the rail. Such an anchor derives holding power from the tension created by the distortion of the "jaw" when it is driven onto the rail flange, causing the

vertical face at the opposite end to snap into place on the rail base. The best-selling anchor on the market before introduction of plaintiff's patent was a jaw-type, the so-called Fair anchor manufactured by Portec Company from a patent issued to Ruppert. (See Appendix B).

Regardless of the exact form to be employed, the qualities making for a good rail anchor—and hence leading to increased sales from the manufacturer's viewpoint— include holding power (the extent to which an anchor will hold the rail and carry out its purpose under increasing pressure), maximum rail-and tie-bearing areas (to prevent gouging of rail or tie caused by relatively narrow anchors bearing against them), and high reapplicability (the ability to reuse rail anchors several times without significant loss of holding power). In mid-1958, Graham M. Fee, then in charge of plaintiff True Temper's Lake City plant, set out to design a better rail anchor under the above criteria. He had a plexiglass model by early fall of that year, and a metal version by October 1. (I App. 59).

Fee's idea was to utilize the general jaw design which had proven so successful in the Fair anchor (and which True Temper had incorporated into the two-piece "Bulldog" anchor it was then manufacturing), but to make several important improvements in construction. First, from the possible T-, I-, angle-, and channel-shaped stock available for fabrication of an anchor, Fee chose the channel; its ⌐⌐-shape would give the best tie-bearing area in conjunction with the best rail-bearing area when the ⌐⌐ was inverted so that its "legs" pointed away from the rail. (*Id.* 57, 62).[2] Second, by designing the anchor so that the rail base "bearing pads" were inclined

---

1. There were, however, two jaw type anchors which, before the '690 patent, had a central section that bowed downward beneath the rail bottom: the British patent to Williams (as shown in Fig. 7 thereof), and the patent to Warr (the so-called Mod-Fair anchor). As discussed below, the Williams design was considered to be most pertinent to the '690 patent application, and so was the subject of tests by plaintiff to show its inferiority to plaintiff's own design.

2. Fee ruled out the use of a steel *bar* to achieve the same tie-bearing and rail-bearing areas as the channel stock provided, because the channel (being essentially a hollowed-out, three-sided bar) utilized less steel to accomplish that goal, and hence was more economical. (I App. 57).

slightly toward the center, holding power would be increased due to increasing tension as the jaw was driven onto the rail flange. (*Id.* 72–73). Third, and perhaps most important, a "downwardly bowed" central portion which was "upwardly convexly rounded" in cross-section [3] would both add to the holding power of the anchor (since, when applied, the bowed portion would flatten somewhat and come under tension), and also increase the tie-bearing area of the anchor. (IV App. 325).[4]

The '690 rail anchor patent was issued on September 3, 1963. True Temper had countered initial Patent Office rejection of Fee's application and claims by submitting amendments, additional remarks, and affidavits of both Fee and Harold E. Sutch concerning tests and calculations on the subject of the application as compared with certain prior art, notably the British patent to Williams. In the meantime, too, True Temper had started to manufacture a rail anchor, like that covered by Fee's application, under the name of Channeloc. In 1973 and 1974, when the '690 patent was in effect, Channeloc sales reached 15.2 and 16.2 million units respectively; the Channeloc thus claimed 32% of the rail anchor market, compared to 28% for the previously front-running Fair anchor. (I App. 105–06). True Temper's own two-piece Bulldog anchor had sold only 2–3 million units annually (roughly 5–10% of the market) before being phased out in preference to the Channeloc, one-and-one-half years after the latter's introduction.

Although the Channeloc was produced on a limited basis by a partially non-automatic process in 1959–60, True Temper naturally desired to turn out the new device at a commercially acceptable level. Graham

Fee assigned to Harold Sutch the task of designing a suitable production method, with the requirements that it be a fully automated system and operate on a continuous basis while still adhering to strict tolerances for a properly functioning rail anchor.

Sutch started work in August of 1959 and took about two years to develop the process. All dies, punches, and transfer mechanisms were made in-house by True Temper, since there was then available no standard equipment for hot-forming steel blanks into channel-shaped, Fee-type rail anchors. (*Id.* 177–78). The end result was a four-station hot-forming press, with automatic transfer from station to station, a different formation occurring at each station (identification stamping, channel formation, bending of jaw, and finishing),[5] and simultaneous formation at each station. This new process allowed True Temper to obtain better anchors than were possible under the old hand-fed method,[6] and at a faster rate—38 units per minute as opposed to three or four per minute. (*Id.* 215). The '198 patent was granted for Sutch's work on December 1, 1964. (V App. 815).

## B. THE ALLEGED INFRINGEMENTS BY DEFENDANT CF&I

Defendant CF&I Steel Corporation is alleged to have infringed both the Fee patent, by coming out with its own "Hi-Guard" channel-stock rail anchor, and the Sutch patent, by the method CF&I uses to produce the Hi-Guard.

CF&I did not introduce the Hi-Guard until December 1972. Deposition testimony reveals, however, that the company became interested in rail anchors to fill out its

---

**3.** As described in the patent claims. (IV App. 288).

**4.** There were other incidental benefits claimed for Fee's channel-shaped anchor, notably the ability to obtain uniform heat treatment of the device due to its relatively uniform cross section. Heat treatment is important to attaining consistent hardness of the metal, and consequently "consistently good product at high production rates." (I App. 57).

**5.** For a schema of the '198 process, see Appendix C.

**6.** Important in this respect was the fact that the hot-forming stock was ejected into the oil quench at the end of the forming process more quickly, and hence at a higher temperature. Quenching at higher temperatures aids in "setting" desirable properties into the formed steel. (I App. 215).

product line in the early fall of 1971. (II App. 330). Corporate officials first assessed whether they should acquire an existing rail anchor producer or create a new design, and in this educational endeavor made trips to the plants of various manufacturers—including True Temper. (*Id.* 319, 332, 375–77).

CF&I ultimately decided to produce a new design, and the channel-shaped anchor which emerged was assertedly dictated by "what we felt was necessary in the performance of an anchor . . . [*i. e.,* h]olding power, reapplication and maximum tie-bearing surface." (*Id.* 333). The Hi-Guard does however bear strong resemblance, at least superficially, to plaintiff's Channeloc. There are also many similarities between the automatic hot-forming process by which the Hi-Guard is manufactured and the process taught by plaintiff's '198 patent.

As noted, the trial court held for defendant on both the '690 and '198 patents, declaring them invalid for obviousness and anticipation in the field, and therefore incapable of being infringed; unenforceable due to plaintiff's inequitable conduct before the Patent Office; and in any event not infringed by defendant's devices.[7]

## II

### THE '690 PATENT

With respect to the enforceability of the '690 patent the trial court stated (I App. 20–21):

> We also find that the conduct of plaintiff in prosecuting its patent application before the Patent Office acts as a bar to enforcement of the 690 patent. Plaintiff failed to disclose material facts to the Patent Office and submitted evidence which was inaccurate, incomplete, and misleading. In addition, we find the failure of plaintiff to disclose relevant information to be substantial in nature. It is

inequitable conduct and is sufficient to make void and unenforceable the patent in question.

The court's findings referred primarily to statements and omissions in the affidavits of Graham Fee and Harold Sutch submitted to the Patent Office after initial rejection of the rail anchor patent, purporting to show the structural superiority of the Fee anchor as compared with the pre-existing Williams design. In the Fee affidavit, for example, it was stated that "two rail anchors of the cross-sectional shape of Fig. 7 of the Williams patent [7a] were machined" at True Temper's Lake City plant, that the Williams anchors were dimensioned identically to the web and sides of the anchor shown in the Fee application "in order that completely comparable tests could be made, due to the equal cross-sectional area of the rail anchors," and that the tests on the two types of anchors revealed the strength of the Fee anchor to be "substantially greater" than that of the Williams patent. (IV App. 323–24). The court referred also to the fact that no complete Williams device was fabricated, tested or compared. In fact, only a section was used in the tests.

Furthermore, the machined Williams section was compared with a complete Fee anchor which had been forged rather than simply machined—and this difference was not disclosed in the affidavit. The Sutch affidavit, too, referred to comparisons of rail "anchors" constructed according to Williams with Fee-type anchors. (*Id.* at 333).

Plaintiff True Temper vigorously challenges the findings. It argues, *inter alia,* that there was ample evidence developed before the Patent Office and at trial demonstrating that True Temper fairly, honestly and accurately distinguished its '690 device from the Williams device; in particular that the Fee affidavit was not deceptive with respect to tests having been done on merely a Williams anchor section because a photograph attached to the affidavit

---

7. Significantly, on the last point, the court found that defendant had not directly copied plaintiff's rail anchor or anchor manufacturing apparatus, either as a result of site visitation of

plaintiff's Lake City plant or otherwise. (I App. 24, 43).

7a. See Appendix D.

showed the section used; and that the section used served proper test purposes. (Plaintiff-Appellant and Cross-Appellee's Brief, 55–56; Plaintiff-Appellant's Reply Brief and Cross-Appellee's Cross-Appeal Brief, 13 *et seq.* ).

██ It is, of course, well established that the exercise of fraud, inequitable conduct, or bad faith in prosecution of a patent application before the Patent Office may result in unenforceability of the patent ultimately issued. *See generally Admiral Corp. v. Zenith Radio Corp.*, 296 F.2d 708, 716 (10th Cir.); *Technograph Printed Circuits, Ltd. v. Bendix Aviation Corp.*, 218 F.Supp. 1, 46 (D.Md.), *aff'd* 327 F.2d 497 (4th Cir.), *cert. denied*, 379 U.S. 826, 85 S.Ct. 53, 13 L.Ed.2d 36. This rule of equity stems from the "paramount interest [of the public] in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct." *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 816, 65 S.Ct. 993, 998, 89 L.Ed. 1389. Because the Patent Office lacks proper means for fully investigating patent claims, a patent applicant stands before it in a confidential relationship. The system could not function successfully if an applicant were "allowed to approach the Patent Office as an arm's length adversary." *Beckman Instruments, Inc. v. Chemtronics, Inc.*, 428 F.2d 555, 565 (5th Cir.), *cert. denied*, 400 U.S. 956, 91 S.Ct. 353, 27 L.Ed.2d 264. Instead, the applicant owes an "absolute duty of full and complete disclosure of all matters reflecting adversely upon his patent," *Shaffer Tool Works v. Joy Manufacturing Co.*, 352 F.Supp. 824, 826 (S.D.Tex.), and he risks non-enforcement of his monopoly on later discovery of a failure to fulfill that obligation. *See Kingsland v. Dorsey*, 338 U.S. 318, 319, 70 S.Ct. 123, 94 L.Ed. 123; *Charles Pfizer & Co. v. F. T. C.*, 401 F.2d 574 (6th Cir.), *cert. denied*, 394 U.S. 920, 89 S.Ct. 1195, 22 L.Ed.2d 453.

██ It is true that the *Precision Instrument* opinion refers to "any willful act" of the applicant respecting his cause of action as grounds for denying equitable enforce-ment. And some cases hold that there must be some element of wrongfulness, willfulness or bad faith to cause a refusal to enforce a patent. *Pfizer, Inc. v. International Rectifier Corp.*, 538 F.2d 180, 186, 189 (8th Cir.), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751; *Nashua Corp. v. RCA Corp.*, 431 F.2d 220, 227 (1st Cir.). However, because of the strong public interest in high standards of disclosure to the Patent Office, it also has been said that it may suffice to show "nothing more than that the misrepresentations were made in an atmosphere of gross negligence as to their truth." *Norton v. Curtiss*, 433 F.2d 779, 796, 57 CCPA 1384. Recklessness in making erroneous submissions to the Patent Office may also be sufficient to warrant a refusal to condone conduct before the Patent Office. *A. H. Emery Co. v. Marcan Products Corp.*, 389 F.2d 11, 18 (2d Cir.), *cert. denied*, 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106; *Deere & Co. v. Hesston Corp.*, 456 F.Supp. 520, 524–25 (D.Utah), *aff'd on other grounds*, 593 F.2d 956 (10th Cir. 1979). *Xerox Corp. v. Dennison Manufacturing Co.*, 322 F.Supp. 963, 968–69 (S.D.N.Y.).

This court upheld findings that the patentee should not be denied relief for conduct before the Patent Office in the *Admiral Corporation* case. We note these comments there on the standard of conduct required, 296 F.2d at 716–17:

> The courts will deny relief to a patentee who has behaved unethically in his dealings with the Patent Office in connection with a patent in suit.

> \* \* \* \* \* \*

If an applicant knows of prior art which plainly describes his claimed invention or comes so close that a reasonable man would say that the invention was not original but had been anticipated, he will not be excused for failure to disclose his knowledge. This case falls outside of that rule. The record sustains the findings of the trial court that Zenith solicitors acted in good faith and were under no professional obligation or moral duty to call the Andrews patent to the attention of the Patent Office while the application which resulted in 025 was pending.

■ From our consideration of the authorities and of the paramount public interest in "seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope," *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., supra*, 324 U.S. at 816, 65 S.Ct. at 998, we conclude that intentional fraud on the Patent Office is not the only ground for withholding enforcement of patents. We feel instead that a standard like that stated by the Court of Customs and Patent Appeals in *Norton v. Curtiss, supra*, 433 F.2d at 796 should be applied, also refusing to enforce patents where "misrepresentations [are] made in an atmosphere of gross negligence as to their truth," *see also Monsanto Co. v. Rohm & Haas Co.*, 456 F.2d 592, 597–600 (3d Cir.), *cert. denied*, 407 U.S. 934, 92 S.Ct. 2463, 32 L.Ed.2d 817, or where there is reckless conduct in representations to the Patent Office, as some cases say.

We note particularly that cases dealing with reporting of test results and similar data to the Patent Office have demanded a higher standard than mere avoidance of intentional fraud on the Patent Office. In *Norton v. Curtiss, supra*, 433 F.2d at 794, the Court of Customs and Patent Appeals stated in terms pertinent to these appeals that:

> Where, as here, an applicant attempts to overcome a rejection by submitting a comparative showing of properties, the very act of submitting that showing, apart from what is represented therein, must also be regarded as a representation. The most meaningful comparison, in such instances, would be that between the claimed invention and the best embodiment of the prior art available.

Therefore, in submitting evidence of comparative tests, unless the circumstances indicate the contrary, an applicant must be held to be representing that his showing includes a fair and accurate demonstration of the closest prior art of which he is aware.

See also *Monsanto Co. v. Rohm & Haas Co., supra*, 456 F.2d at 597 n.10; *Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.*, 443 F.2d 867, 881 (2d Cir.), *cert. denied*, 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156.

■ Turning to the findings and the evidence here on the issue of misconduct before the Patent Office, we note that much of the conduct in question concerned the submissions made by True Temper as to test results and calculations responding to the Patent Examiner's initial reluctance to grant the '690 patent. The trial court found that contrary to the clear implication of the Fee and Sutch affidavits on a critical point, no complete Williams device was fabricated, tested or compared; that the affidavits expressly referred to photos as representing a rail anchor, and not a mere section thereof; that the affidavits said the True Temper device deflected less than the Williams device; that, however, the comparison was between a forged True Temper device and a *machined* Williams representation; and that trial testimony reflected that the comparison was invalid since machined stock inherently will deflect more than forged stock.[8] The findings of the trial court (I App. 18, 21) are supported by the original record as cited. (IV Orig. Tr. 312–14; V Orig. Tr. 400–01; *see also* I App. 71–74).

The Patent Office was not advised by the affidavits that it was merely a Williams section which was compared with a Fee

---

**8.** The Fee affidavit stated in part (IV Ex.App. 323–24):

> That two rail anchors of the cross-sectional shape of Fig. 7 of the Williams patent were machined at the Lake City Works of True Temper Corporation; the width and height of the web and sides, respectively (referred to as side 'r' and web 's' in the specification of Williams) of the Williams rail anchor were dimensioned identically to the web and sides

of the anchor shown in the Fee application referred to herein *in order that completely comparable tests could be made, due to the equal cross-sectional area of the rail anchors . . . .* (Emphasis added).

It is thus apparent that the affidavit was representing that completely comparable tests had been made and that their results were being reported to the Patent Office.

anchor. At trial Mr. Fee conceded that the holding power of a rail anchor is determined by the spacing in the jaw section and that he had no way of determining the holding power of the Williams anchor because he didn't make a Williams anchor. (I App. 73). The testimony of Mr. Sutch at trial revealed similar difficulty as to his affidavit. He admitted that True Temper never had a complete Williams anchor. (I App. 97). There was some contradictory testimony by Mr. Sutch, defending his conclusions based on calculations from tests using the Williams section (*id.* at 99–100), but this did not demonstrate that the findings by the trial court were clearly erroneous.

In particular we note the testimony of CF&I's expert in engineering and patent interpretation, Dean Fischer. Dean Fischer had conducted his own tests of the Williams design, as compared with the Fee design, and arrived at significantly different results from those which the tests discussed in the Fee affidavit indicated. Fischer first fabricated a "Williams-type" anchor by using bar stock tapered in the manner disclosed in Fig. 7 of the Williams patent (App. D hereto), and then turned into a channel shape and put through the normal processes CF&I uses to manufacture its Hi-Guard anchor, including hot-forming.

Fischer tested the anchor so obtained (Def. Ex. H) against the Channeloc, and found they had the same holding power. Fischer also machined a channel section (Def. Ex. I) comparable to that used in the Fee affidavit tests and compared it with his Williams-type anchor; although the difference amounted only to "a few thousandths of an inch," the forged anchor deflected less than the machined channel. From these tests Dean Fischer concluded that (I App. 133–34):

> [Y]ou should use an anchor that had been through the hot forming process rather than a [machined] channel if you were going to draw any conclusions from the effect of a shape of a section.

As noted, True Temper argues that there was no misleading of the Patent Office in the fact that a section of the Williams anchor instead of a whole anchor had been used in Fee's tests. True Temper says the photographs attached to the affidavit revealed the section which was used. And we note that the Fee affidavit did state that "my anchor" and the "Williams anchor" were placed sideward "as shown in the attached [photographs]." The trial court rejected a similar argument, however, stating that the photographs did not ameliorate the effect of the misleading statements. We feel that the portrayal in the photographs (Defendant's Exhibits VV–1 and VV–2) is not such as to overcome the positive statements in the affidavit that a Williams "anchor" was tested. And while the Fee affidavit did reveal that the "rail anchors" of the Williams type tested were "machined," *see* note 8, *supra*, the affidavit spoke of "completely comparable tests," when actually the tests were of a machined Williams section and a hot-forged Fee anchor.

True Temper next says by brief that it is "common engineering knowledge" that tests on a section or a model of an element can be as reliable as tests on the entire element. (Plaintiff-Appellant's Reply Brief, 13–14). This argument, however, is met by the expert testimony of Dean Fischer that the examiner should have been told very clearly that there were no tests made on a finished Williams anchor, that True Temper had no such anchors, and that the only tests made were on a simple channel section not formed or shaped like an anchor, and that the section had not been hot-formed like an anchor. (I App. 134).

True Temper also relies on "confirming tests" by its expert, Dr. Kasuba (I App. 110–111), which were performed for trial purposes. Dr. Kasuba did admit, however, that he "would imagine" that hot-forming would increase an anchor's strength, as compared to machining. (*Id.* at 158). Moreover, his tests were subject to some question because of the fact that his calculations were not based on use of a cross-sectional shape conforming to the relevant drawing in the Williams patent (Fig. 7). He conceded that use of such a shape would

have affected his calculations. (*Id.* at 157–58).

Finally, True Temper strenuously contends in a supplemental brief that the requirement of materiality has not been met so as to justify denial of enforcement of the '690 patent. Pointing to new Patent Office Rule of Practice 56, 37 C.F.R. § 1.56 (as amended on March 1, 1977)[9] which expressly requires patent applicants to disclose information "which is material to the examination of the application," True Temper argues that information is material in this sense only if the examiner would not have issued the patent "but for" the applicant's failure to disclose the information in question, and that this was not shown here.

We feel, however, that the Fee and Sutch affidavits were clearly shown to be material to issuance of the '690 patent.[10] We note that the trial judge found that "[p]laintiff failed to disclose material facts to the Patent Office and submitted evidence which was inaccurate, incomplete and misleading." And the court found "the failure of plaintiff to disclose relevant information to be substantial in nature." Although the trial judge here did not phrase his findings in strict terms of "but-for" causality, *see Norton v. Curtiss, supra,* 433 F.2d at 795, we feel that the findings and the record here adequately support the denial of enforcement of the patent. *See Timely Products Corp. v. Arron,* 523 F.2d 288, 297–98 (2d Cir.); *SCM Corp. v. Radio Corporation of America,* 318 F.Supp. 433, 449–50 (S.D.N.Y.). The withheld information was material in that it was relevant and clearly significant to the consideration of the application by the Patent Office. *See Monsanto Co. v. Rohm & Haas Co., supra,* 456 F.2d at 599–600.

The weighing of the conflicting evidence and the testimony of the experts was for the trial judge who saw and heard the witnesses. Considering the conflicting arguments and evidence, we cannot say the findings of the trial court were clearly erroneous as to the misconduct of plaintiff True Temper before the Patent Office or that the holding of unenforceability was in error.

The trial court concluded that whether intentional or not, misleading information of a substantial nature submitted during prosecution of a patent tends to destroy the patent's normal presumption of validity. The court also concluded that inequitable conduct in prosecuting a patent "as found here" is sufficient to bar enforcement of the patents, that a duty of candor is imposed on the patent applicant because of inability of the Patent Office to independently investigate the factual data, and that inequitable conduct is especially critical in patent applications, citing *Turzillo v. P & Z Mergentime,* 174 U.S.App.D.C. 318, 532 F.2d 1393, *cert. denied,* 429 U.S. 897, 97

---

**9.** In this connection, we should note that the fact that it was only on March 1, 1977, with the amendment of Patent Office Rule 56, that patent applicants were put under an express obligation by rule to disclose material information, is not dispositive as to plaintiff's duties as an applicant before that date. The amended rule merely represented a codification of existing case law on the obligation of applicants to disclose pertinent information or prior art, or face possible invalidation of the patent once issued. *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.,* 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250; *Admiral Corp. v. Zenith Radio Corp.,* 296 F.2d 708 (10th Cir.).

**10.** The Fee affidavit was submitted in an effort to overcome the Patent Examiner's initial rejection of True Temper's claims—a rejection based largely on his view that the perceptible differences between the Channeloc anchor and the pre-existing Williams patent were "of no significance and a variation in design within the realm of one skilled in the art." (IV App. 314). Although the patent was not granted immediately on receipt of that affidavit, the Examiner did state that "a showing that the [True Temper] anchor is more easily applied than prior art structures but maintains the prior art's holding character *would be influential* in the determination of patentability." (*Id.* at 326, emphasis added).

The Sutch affidavit was thereupon submitted together with remarks of counsel making reference to both the Fee and Sutch affidavits (*id.* 329, 343), and the subject patent was issued. It is reasonable to conclude that, had he known that the reported comparisons were inherently unreliable, the Examiner would have again denied the patent—at the least requiring True Temper to conduct more meaningful tests.

S.Ct. 260, 50 L.Ed.2d 181; *Schnadig Corp. v. Gaines Manufacturing Co., Inc.,* 494 F.2d 383 (6th Cir.), and *Charles Pfizer & Co. v. F.T.C.,* 401 F.2d 574 (6th Cir.), *cert. denied,* 393 U.S. 1022, 89 S.Ct. 630, 21 L.Ed.2d 566. These conclusions and the cases cited demonstrate that the court made its findings on the basis that there was impermissible conduct before the Patent Office in the nature of recklessness or gross negligence relating to nondisclosure of material testing information, regardless of whether or not intentional conduct was involved.

As we have discussed earlier, we feel this is a proper standard to apply. We thus sustain the findings and affirm the trial court's conclusion that the '690 patent may not be enforced because of plaintiff True Temper's misconduct before the Patent Office. In view of this holding, we need not consider the further holdings of the trial court that the patent was invalid on other grounds and not infringed.

III

THE '198 PATENT

As noted, the trial court held that the '198 patent on True Temper's apparatus and process for producing its Channeloc rail anchors was invalid for obviousness and lack of novelty, *inter alia.* In applying the patentability requirements imposed by 35 U.S.C. §§ 102 and 103, relating to novelty and lack of obviousness, the trial court stated (I App. 35):

> We find, therefore, that Mr. Sutch did nothing unobvious, and that he utilized well-known techniques and equipment, combining them in an obvious fashion. The results of the Sutch patent and/or manufacturing process was not a new and useful invention. The claims of the 198 patent therefore are composed of well-known elements in a combination which does not produce a novel functional result. The claims of the 198 patent are not patentable, and the patent is therefore invalid. 35 U.S.C. §§ 102–3.

Plaintiff True Temper challenges both the novelty and obviousness findings and conclusions. We need not treat novelty since we feel that the ruling on obviousness should be affirmed. Therefore we will consider only True Temper's arguments on obviousness, which essentially are that the trial court failed to fully understand the '198 patent and the prior art, that the court failed to make the required comparison between them, that the court never made a determination of ordinary skill in rail anchor art, and that the findings and conclusions on obviousness are clearly erroneous. (Plaintiff-Appellant and Cross-Appellee's Brief, 54–55).

■■■ Obviousness, of course, is to be assessed as of the time the invention in question was made and from the viewpoint of "a person having ordinary skill in the art to which said [invention] pertains." 35 U.S.C. § 103. The issue necessarily involves several basic factual inquiries, outlined in *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545, involving the scope and content of the prior art, the differences between the prior art and the patent claims in issue, and the level of ordinary skill in the pertinent field. There is also to be considered, however, the general statutory presumption of validity which attaches to a patent once issued by the Patent Office. 35 U.S.C. § 282. See generally *Sidewinder Marine, Inc. v. Starbuck Kustom Boats and Products, Inc.,* 597 F.2d 201 (10th Cir., 1979). We must, therefore, in reviewing the findings of the trial court, consider whether they are supported by the record or are clearly erroneous under the standard of Rule 52, F.R.Civ.P., taking into account the presumption of validity of the patent. *See CMI Corp. v. Metropolitan Enterprises, Inc.,* 534 F.2d 874, 880 (10th Cir.).

We note that the '198 patent was issued with citation to only two prior art patents (Wolhaupter and Schneider), and that defendant CF&I at trial presented several examples of prior art—patented and otherwise—which CF&I's expert Fischer testified were more pertinent to the Sutch process than the cited patents. (II App. 246). This newly introduced prior art included, notably, plaintiff True Temper's own fully

automatic system for manufacture of the Bulldog anchor, its hand-fed system for production of the Channeloc in 1959–60, as well as the automated ·press developed by Erie Foundry for the forging of crawler track .links or other such items. Against this background, as the trial court recognized, the statutory presumption—rebuttable in any event—is "seriously weakened." (I App. 35, 36).

We are convinced that the trial court's findings on obviousness are amply supported by the record.[11] Testimony of the inventor revealed the view that his invention consisted in the combination of a number of elements concededly well-known in the art. These elements include the concept of hot-forming of steel; the use of a press with a reciprocating ram to accomplish such hot-forming; the concept of multiple die stations in the press with work done at each station simultaneously; automatic transfer means between the stations; and the use of movable dies in conjunction with stationary dies in such a press. (Id. 210). Patentability of the '198 process, according to Mr. Sutch, stems from the fact that there had previously been no such combination, particularly not in the manner in which he devised it—allowing "manufacture [of] a channel-shaped rail anchor on a continuous basis at a competitive cost," and turning out "quality anchor[s]."[12] (Id. at 211–12).

True Temper's expert witness, Joseph W. Spretnak, a physical and mechanical metallurgist, phrased the inventive aspect of the Sutch patent more exactly, while still conceding that the bulk of its elements were old in the art. (II App. 278, 298). Thus, he testified that Sutch's combination was unique and patentable because it represented a sheet metal process adapted to deal with dimensions of flat blank that are characteristic of *plate* (*i. e.*, greater than .30 inches thick) and not sheet, and further adapted to the hot-forming of high carbon steels (sheet-forming had previously normally involved a much lower carbon-content steel). (Id. at 273). In Mr. Spretnak's opinion, the process devised by Mr. Sutch was not obvious: none of the prior art—including that cited by CF&I at trial—taught or implied the production of a channel shape from high carbon steel in excess of .30 inches thick at 1850° F., and it was questionable before the '198 process whether this task "could be done feasibly from a technical viewpoint and from an economic viewpoint." (Id. at 289–90).

A combination of known elements may be patentable, but the result in such a case must be truly synergistic. Combination patents are subjected to·a scrutiny "proportioned to the difficulty and improbability of finding invention in an assembly of old elements." *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.,* 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162. Here the record reveals True Temper's own Bulldog and early Channeloc production systems which are particularly pertinent in this respect. The process of manufacture of the ⌊⌋-shaped Bulldog "clamp" element involved automatic transfer of hot-forming steel blanks—being of plate thickness—with work being done simultaneously at each station. (I App. 189, 200; II App. 293). There was, according to one of defendant's experts, "no fundamental difference" between the formation of the Bulldog ⌊⌋ under that system and the formation of the Channeloc channel out of flat blanks in the '198 system. (II App. 230). The early Channeloc production proc-

**11.** On this point, it cannot fairly be said that the trial court failed to carry out the necessary factual inquiries under *Graham v. John Deere Co., supra.* (Pl. Brief 54–55). Explicit findings in the exact terms of *Graham* are not required, "[s]o long as it is clear that the court has grappled with the problems presented." *Sidewinder Marine, Inc. v. Starbuck Kustom Boats and Products, Inc.,* 597 F.2d 201 (10th Cir.). *See also M. B. Skinner Co. v. Continental Industries, Inc.,* 346 F.2d 170, 173 (10th Cir.), *cert. denied,* 383 U.S. 934, 86 S.Ct. 1062, 15 L.Ed.2d 851.

**12.** The high-speed automation was assertedly most important to achieving this high-quality, commercially-viable end product—the quicker a hot-forming piece reaches the oil quench, the better from the standpoint of its physical properties. *See* note 6 *supra.*

ess basically lacked only the automatic transfer feature of the '198. Otherwise it hot-formed the desired rail anchor in the same dimensions as the Sutch process later would, and took essentially the same steps in doing so. (I App. 219).

In addition, the Erie Foundry press cited by defendant taught high-speed, high-temperature formation of crawler track links (with potential application to many other devices), utilizing automatic transfer, upper and lower cooperating dies, and so forth, before Mr. Sutch had designed his process. (II App. 225). And there is other testimony pointing generally to the obviousness of the '198 patent at the time of its creation. (*Id.* at 230–31, 239, 248, 259).[13]

■ As pointed out by Harold Sutch at trial, there was in 1959 no "standard or conventional equipment . . . available for hot-forming steel blanks into . . channel-shaped anchors of the Fee type." (I App. 177). However, to view the '198 patent in such a narrow light, *i. e.,* concentrating on the configuration of the end product, addresses only the questions of novelty and anticipation under 35 U.S.C. § 102, and not the question of obviousness under § 103. Obviousness turns not on whether a device has already essentially been produced in the field, but on whether, though not yet produced, it would nevertheless have been conceivable to a worker of ordinary skill in that field. As conceded by plaintiff's witness Mr. Spretnak, when confronted with the repetition of functions in metal-forming presses (*e. g.,* cooperating stationary and movable die members) but the great variety of possible items to be formed, "[y]ou decide what the shape is to be and then design the dies accordingly."

■ Considering plaintiff True Temper's arguments and the evidence it points to, we nevertheless are satisfied that the trial court's findings and conclusions on ob-

viousness of the '198 patent are amply supported by the record as a whole, and affirm that holding.

■ Moreover, since it is so closely related to the obviousness of the '198 patent, we also address the trial court's holding of unenforceability of that patent due to inequitable conduct before the Patent Office. In this connection, the trial court labeled plaintiff's conduct, in not revealing to the Patent Office its methods of manufacture of the Bulldog and early Channeloc anchors, "a most serious failure to disclose . . . obviously relevant facts." (I App. 36). These manufacturing systems were matters "peculiarly within [True Temper's] own knowledge" (*id.* 35–36), and the early Channeloc production mechanism in particular was "virtually identical, or closely akin, to that of the '198 patent." (*Id.* at 36). The court found that had the Patent Office been aware of these systems, which together taught manufacture of channel-shaped rail anchors using heated metal blanks of plate thickness, with automatic transfer from station to station in synchronization with the ram of the press, the Office "may well have decided differently" on the patentability of the Sutch device. (*Id.*).

Such findings amply support a holding of inequitable conduct rendering the patent unenforceable. As we stated in *Admiral Corp. v. Zenith Radio Corp., supra,* 296 F.2d at 716:

> If an applicant knows of prior art which plainly describes his claimed invention or comes so close that a reasonable man would say that the invention was not original but had been anticipated, he will not be excused for failure to disclose his knowledge.

*See Turzillo v. P & Z Mergentime,* 174 U.S.App.D.C. 318, 324, 532 F.2d 1393, 1399, *cert. denied,* 429 U.S. 897, 97 S.Ct. 260, 50 L.Ed.2d 181; *Timely Products Corp. v. Ar-*

---

13. The trial court has a detailed discussion in its opinion of the prior art evidence presented by defendant, including publications, which supports the conclusion of invalidity for obviousness. (I App. 28–34). We should note that the testimony of plaintiff's expert Mr. Spretnak

lost much of its force when it turned out that the witness, though testifying as to what the prior art disclosed, had not known of the Bulldog or early Channeloc production systems before appearing at trial. (II App. 299).

*ron,* 523 F.2d 288, 297–98 (2d Cir.); *Buzzelli v. Minnesota Mining & Manufacturing Co.,* 521 F.2d 1162, 1166 (6th Cir.).

We accept the trial court's characterization of the prior manufacturing systems as "obviously relevant," and "virtually identical, or closely akin" to the '198 system. The Bulldog and early Channeloc systems thus pointed strongly to anticipation and/or obviousness of the '198 patent, *see Scaramucci v. Dresser Industries, Inc.,* 427 F.2d 1309, 1314 (10th Cir.), and it was a breach of True Temper's duty to the Patent Office not to disclose such prior art which was clearly within its knowledge and which it should have realized was highly pertinent. *See Turzillo, supra; Schnadig Corp. v. Gaines Manufacturing Co.,* 494 F.2d 383, 393 (6th Cir.); *but cf. Wen Products Inc. v. Portable Electric Tools, Inc.,* 367 F.2d 764, 767 (7th Cir.). We feel, too, that sufficient materiality of the nondisclosure is shown on these facts and in the trial court's findings.

In sum, we sustain these findings and affirm the holding that the '198 patent is unenforceable due to misconduct before the Patent Office, as we also do the holding of obviousness of the '198 patent.

## IV

### ATTORNEY FEES AND COSTS

By way of cross-appeal defendant CF&I seeks reversal of the trial court's denial to it of reasonable attorney fees and its costs of suit.

Section 285 of the Patent Act, 35 U.S.C. § 285, provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." In declining to give such an award to defendant CF&I, which had prevailed on all substantive issues, the trial court stated that "[e]xceptional circumstances are not present to support an award of attorney fees. Our view of the totality of the evidence indicates that the infringement action was brought in good faith." (I App. 43–44). Although CF&I concedes that the grant of fees under § 285 is within the sound discretion of the trial court, *see, e. g., Iron Ore Company of Canada v. Dow Chemical Co.,* 500 F.2d 189, 195 (10th Cir.), it contends that the court here applied the wrong legal standard in exercising that discretion and should be reversed.

█ It appears from some cases dealing with § 285 that a patent plaintiff's motives in bringing or tactics in maintaining his suit may justify an award of attorney fees. Thus, where the plaintiff was aware of the obvious invalidity of his patent at the time he brought suit, *Tidewater Patent Development Co. v. Kitchen,* 371 F.2d 1004, 1013 (4th Cir.), *cert. denied,* 389 U.S. 821, 88 S.Ct. 46, 19 L.Ed.2d 74, or where the litigation once instituted was vexatious or unduly protracted, *Uarco Incorporated v. Moore Business Forms, Inc.,* 440 F.2d 580, 586 (7th Cir.), *cert. denied,* 404 U.S. 873, 92 S.Ct. 91, 30 L.Ed.2d 117, the case may be deemed "exceptional" within the statute so that the prevailing defendant is saved from the undue hardship of bearing his own fees. *See Parker v. Motorola, Inc.,* 524 F.2d 518 (5th Cir.), *cert. denied,* 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799; *Seismograph Service Corp. v. Offshore Raydist, Inc.,* 263 F.2d 5 (5th Cir.); *see also L. F. Strassheim Co. v. Gold Medal Folding Furniture Co.,* 477 F.2d 818 (7th Cir.).

The trial judge was undoubtedly thinking along these lines here when he denied CF&I its attorney fees, finding from the "totality of the evidence" that True Temper had brought the action in "good faith." We accept this finding.[14] As urged by defendant, however, there is an additional factor to be taken into account in passing on the

---

14. We are mindful that this finding may be viewed as inconsistent with the holdings that neither the '690 nor the '198 patents are enforceable because of misconduct before the Patent Office. However, the patents were issued and there is sufficient substance to True Temper's overall position that we cannot say that it was error to hold that this suit was brought in good faith.

fee question under § 285. The patentee's conduct in originally obtaining his patent should be scrutinized, since fraud on the Patent Office in that endeavor is enough itself to make a case exceptional, as is "conduct short of fraud and in excess of simple negligence." *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Co.,* 407 F.2d 288, 294 (9th Cir.). As the court there stated:

> Such conduct is a serious breach of the patentee's duty to the Patent Office. The party who succeeds in invalidating the unlawful patent performs a valuable public service. It is appropriate under such circumstances to reward the prevailing party by giving him attorney's fees for his efforts, and it is equally appropriate to penalize in the same measure the patentee who obtained the patent by his wrongdoing.

*Id.* See also *Maurice A. Garbell, Inc. v. Boeing Co.,* 546 F.2d 297, 300 (9th Cir.), *cert. denied,* 431 U.S. 955, 97 S.Ct. 2677, 53 L.Ed.2d 272; *Deyerle v. Wright Manufacturing Co.,* 496 F.2d 45, 55 (6th Cir.); *Pickering v. Holman,* 459 F.2d 403, 408 (9th Cir.); *Uarco Incorporated v. Moore Business Forms, Inc., supra,* 440 F.2d at 586.

This court has specifically recognized such a rule in the application of § 285 in *Q-Panel Co. v. Newfield,* 482 F.2d 210, 211 (10th Cir.): "The statute contemplates such misconduct upon the part of the losing party as to constitute fraud on the Patent Office or so unfair and reckless as to make it unconscionable for the prevailing party to sustain the expense of counsel." See *Halliburton Co. v. Dow Chemical Co.,* 514 F.2d 377, 381–82 (10th Cir.).

■ Since the trial court did not refer to the misconduct which it found before the

Patent Office in connection with the denial of attorney fees, we do not know whether this factor was considered on this point, or perhaps mistakenly deemed irrelevant. Thus we feel we should vacate the judgment in that respect and remand for the trial court to make findings and to exercise its discretion anew on attorney fees, taking that possible ground for the allowance of fees into account.[15] We cannot agree that we should make such a determination, for this is a matter which the trial court ought to determine in the first instance. *United States v. Arizona Canning Co.,* 212 F.2d 532, 535 (10th Cir.).

With respect to costs of suit, the trial court directed that each party should bear its own costs. (I App. 45). No statement appears in the court's findings, conclusions or its judgment to directly explain the ruling on costs. As noted, in denying CF&I's claim for attorney fees the court did find that the infringement action was brought in good faith. CF&I argues that it was error and an abuse of discretion to refuse the taxation of costs against True Temper.

■ Rule 54(d), F.R.Civ.P. provides that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." The award of costs is within the trial court's discretion. See *Homestake Mining Co. v. Mid-Continent Exploration Co.,* 282 F.2d 787, 804 (10th Cir.). However, in view of the wording of the Rule, we feel that there is a presumption that the prevailing party shall recover costs, and that some reason must appear for penalizing the prevailing party if costs are to be denied; otherwise the Rule would have little substance. *Popeil Brothers, Inc. v. Schick Electric, Inc.,* 516 F.2d 772, 775 (7th Cir.); see *Walters v. Roadway Express, Inc.,* 557 F.2d 521, 526

---

**15.** In this connection, since the case is being remanded on the attorney fee question, we feel it proper to make one further observation relating to the '198 patent. The misconduct before the Patent Office found by the trial court was in True Temper's failure to disclose pertinent prior art. We have held that "nondisclosure of prior art is insufficient to sustain an award of attorney fees unless it is done in bad faith and with intent to deceive." *Halliburton Co. v. Dow Chemical Co.,* 514 F.2d 377, 381 (10th Cir.). We intimate no view 'whatever as to what the proper finding and exercise of discretion should be in this regard, but the issue should be considered in light of this standard when the matter is considered on remand.

(5th Cir.); *ADM Corp. v. Speedmaster Packaging Corp.,* 525 F.2d 662, 664–65 (3d Cir.); *Pickering v. Holman,* 459 F.2d 403, 408 (9th Cir.); *Lewis v. Pennington,* 400 F.2d 806, 819 (6th Cir.), *cert. denied,* 398 U.S. 960, 90 S.Ct. 2177, 26 L.Ed.2d 546.

 We feel that the present findings and orders do not express adequate reasons for the denial of costs. We therefore believe that we cannot now properly review the costs question, which in such a suit will obviously involve substantial sums. Thus, as in the case of attorney fees, the judgment is vacated insofar as the denial of costs is concerned, and the case is remanded for the trial court to reconsider and express a ruling on costs with a statement of reasons for its determination. *See Subscription Television, Inc. v. Southern California Theatre Owners Ass'n.,* 576 F.2d 230 (9th Cir.).

Accordingly, the judgment is affirmed in part and vacated in part and the cases are remanded for further proceedings consistent with this opinion.

APPENDIX—A

## DEFENDANT'S EXHIBIT Q

Sept. 3, 1963 G. M. FEE 3,102,690

RATL ANCHORS

Filed June 29, 1959

Fig. 1

Fig. 2

Fig. 5

Fig. 3

Fig. 4

INVENTOR.
GRAHAM M. FEE
BY
ATTORNEY

APPENDIX—B–1

## DEFENDANT'S EXHIBITS (7)

Sept. 13, 1955 M. K. RUPPERT 2,717,740

Filed April 24, 1952 2 Sheets—Sheet 1

*Fig. 1.*

*Fig. 2.*

*Fig. 3.*

INVENTOR.
Max K Ruppert
BY
Harvey M. Gillespie
Atty.

*Fig. 4.*

*Fig. 5.*

*Fig. 6.*

INVENTOR.

BY *Max K. Ruppert*

*Harvey M. Gillespie*
Atty.

514

## APPENDIX—C
### DEFENDANT'S EXHIBIT RRRR

"Channeloc" Production
(U.S. Pat. No. 3,159,198)

First Station — Stamped

Second Station — Formed Into U-Shape

Heated Bar Stock Blank Fed From Storage Magazine

One End Formed Into Curved Shape — Third Station

Finished Shape — Fourth Station

Ejected Into Oil Quench

Automatic Transfer

APPENDIX—D

[This Drawing is a reproduction of the Original on a reduced scale.]

Fig.1.

Fig.2.

Fig.3.

Fig.4.

Fig.5.

Fig.6.

Fig.7.

Malby & Sons, Photo-Lith.