**WARNER–JENKINSON COMPANY, a division of the Seven-Up Company,**

**and**

**H. Kohnstamm & Company, Inc., Plaintiffs,**

**v.**

**ALLIED CHEMICAL CORPORATION and Buffalo Color Corporation, Defendants.**

**No. 76 Civ. 2744.**

United States District Court, S. D. New York.

July 31, 1979.

---

13. *Southern Pacific Co. v. Jensen,* 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917).

Kenyon & Kenyon, New York City, for plaintiffs Warner-Jenkinson Company and H. Kohnstamm & Company, Inc.; Francis T. Carr, Paul Lempel, Edwin Baranowski, New York City, of counsel.

Donald G. Leavitt, Koenig, Senniger, Powers & Leavitt, St. Louis, Mo., for Warner-Jenkinson Co.

Patrick J. Joyce, Stamford, Conn., for H. Kohnstamm & Company, Inc.

Fish & Neave, New York City, for defendants; William K. Kerr, William J. Gilbreth, New York City, of counsel.

Battle, Fowler, Lidstone, Pierce & Kheel, New York City, for defendant Buffalo Color Corp.

## OPINION

EDWARD WEINFELD, District Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs Warner-Jenkinson Co. ("Warner") and H. Kohnstamm & Co. ("Kohnstamm"), two commercial manufacturers of synthetic food colors, brought this action against defendants Allied Chemical Corporation ("Allied" or "Allied Chemical") and Buffalo Color Corporation ("Buffalo Color"), the patentee and assignee, respectively,[1] of two patents relating to a red food dye known as FD & C No. 40 ("Red 40"), the leading red food color now on the market. This is the second such action commenced by plaintiffs. The first lawsuits were brought against Allied Chemical in January 1972 (and were subsequently consolidated for trial purposes), seeking a declaratory judgment of invalidity, noninfringement, and unenforceability of Allied's patents for Red 40.[2] Allied counterclaimed for infringement.

After extensive pretrial discovery over a three-year period, during which twenty-seven witnesses were deposed and more than 30,000 pages of documents were produced, the trial commenced before Judge William Conner of this Court, with each side prepared to proceed with an array of fact and expert witnesses. On the second day of trial, after cross-examination of plaintiffs' first witness, settlement negotiations were

---

1. In June 1977, Allied assigned to Buffalo Color all its right, title, and interest to each of the patents in suit. Buffalo, under a supplemental complaint, is named as a defendant and asserts a counterclaim for infringement from the time it acquired the patents.

2. Jurisdiction in these cases is based on 28 U.S.C. § 1338.

initiated; discussions continued over a period of four months. The settlement reached by the parties provided for a $200,000 payment by plaintiffs to Allied; release of plaintiffs by Allied from all liability for infringement based upon their activities prior to March 1, 1975; release of Allied by plaintiffs from charges of unfair competition prior to March 1, 1975; and the grant to each plaintiff of a manufacturing license by Allied Chemical, with provision for a royalty charge of 17½% of the sales price of all quantities of Red 40 manufactured and sold by plaintiffs. Based on the parties' stipulation, an order was entered on July 23, 1975 by Judge Conner, dismissing the plaintiffs' claims of patent invalidity without prejudice, their unfair competition claims with prejudice, and defendants' infringement claims without prejudice.

The instant complaint was filed shortly after another, competing, red food dye was banned by the Food & Drug Administration ("FDA") in February 1976. Plaintiffs again request a declaratory judgment that the Red 40 patents are invalid, unenforceable, and not infringed by plaintiffs and as a consequence further seek invalidation of the licensing agreements, restitution of royalties paid to defendants under those agreements, and damages resulting from defendants' alleged unfair competition subsequent to March 1, 1975. Defendants deny plaintiffs' averments and counterclaim against each plaintiff for patent infringement in the event that plaintiffs are held to be unlicensed because the existing agreements are void. In addition, Allied alleges a counterclaim against plaintiffs for breach of the settlement agreement. After a line-by-line review and study of the 2500-page trial record, the several thousands of pages of exhibits received into evidence, and the Court's daily trial notes, which include a contemporaneous appraisal of each witness and his demeanor, the Court finds that plaintiffs have failed to sustain their burden of proof on the claims asserted in their complaint and, similarly, that defendants have not established their counterclaims.

## I

The patents in suit, numbered 3,519,617 ('617) and 3,640,733 ('733), were granted by the United States Patent Office to Allied for an invention, the main object of which was to provide "highly soluble non-toxic monoazo dye combinations which are useful in the coloring of edible substrates."[3] "Manifestly, the validity of each of these patents turns on the facts";[4] background facts bearing on the issues in this case include the history of the food dye industry, the circumstances under which the chemical compositions were synthesized and patented, and the impact of the patent on the industry.

## A

At least since the 1880s, the marketplace has recognized the usefulness of artificial color in foods, primarily to correct for natural variations in food color and to make edibles more visually appealing and palatable.[5] By 1900 most of the food dyes used in this country were synthetic "coal-tar dyes," that is, dyes prepared from derivatives of compounds recovered in the distillation of coal (particularly benzene and naphthal-

3. Exh. 3. Initially, Allied applied for only one patent, but after the Patent Examiner required separation of dyestuff claims and claims directed to edible substrates colored with such dyestuffs, a second application was filed, based on the same disclosures. The '617 "composition of matter" patent embraces nine claims, and the subsequently issued '733 "use" patent includes ten claims. Defendants' averments of infringement at trial were limited to claim 6 of the '617 patent and claim 7 of the '733 patent (describing the structure of Red 40); plaintiffs' averments of invalidity, noninfringement, and unenforceability were directed to all claims of both patents. The Court's opinion focuses on claims relating to Red 40.

4. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 5, 86 S.Ct. 684, 687, 15 L.Ed.2d 545 (1966).

5. National Academy of Sciences (Committee on Food Protection, Food & Nutrition Board, Division of Biology & Agriculture, National Research Council), Food Colors 9 (1971) (Exh. BB) [hereinafter cited as Food Colors Study].

ene).[6] Among the most common coal-tar dyes were the simplest—"phenyl-azo-naphthol dyes" having the following general chemical structure:[7]

Phenyl Azo Naphthol

Such dyestuffs are prepared by diazotizing the "phenyl intermediate" and then bonding it with the "naphthol intermediate," a process in use for over 100 years.[8]

At the turn of the century, Dr. Bernhard C. Hesse, a German dye expert, was retained by the United States Department of Agriculture to investigate the safety of coal-tar dyes. In his classic study, Dr. Hesse described several desired characteristics of coal-tar food dyes: (1) nontoxicity and safety for human consumption; (2) desirable shade and brightness, together with high tinctorial strength; (3) stability of the color when subjected to great heat, light, reducing agents, and acids that are used in the preparation of foods; (4) solubility in water and other liquids; (5) suitability for mixing or blending with other colors; and (6) lack of taste, odor, or other potentially offensive characteristics.[9] Hesse's research focused on the first desideratum, safety and nontoxicity, and sifted through dozens of coal-tar dyes to select seven that were certified for general food use under the Pure Food and Drug Act of 1906.[10] Hesse's choices—including three red dyes, Ponceau 3R (now known as "Red 1"), Amaranth ("Red 2"), Erythrosine ("Red 3")[11]—were made only after extensive physiological testing on dogs, rabbits and humans, since "[i]t has been known since 1888 that it is unsafe to attempt to predict the harmfulness or the harmlessness of coal-tar colors by analogy" to other, chemically similar, dyes.[12]

Accordingly, what the food color industry strives for, and indeed must seek to achieve under exacting statutory standards, is, first and foremost, nontoxicity and safety of the product for human consumption. But to achieve commercial success other properties are also of importance. Between 1907 and 1938, due to industry demand for additional shades and further safety testing, other new colors were added to the approved list. One such dye, now known as "Red 4" (a scarlet color slightly less blue than Red 1),

6. The basic building block of coal-tar dyes is benzene, which is an organic compound consisting of six carbon atoms ("C") and six hydrogen atoms ("H") in a molecular ring containing three alternating double bonds:

Naphthalene is an aromatic organic compound composed of two benzene rings conjoined at one of the double bonds.

7. The phenyl group is a benzene ring absent one of its hydrogen atoms; the naphthol group is a naphthyl group absent two of its hydrogen atoms, one of which has been replaced by a hydroxyl radical ("OH"). The azo group is the main chromophoric component of the compound and consists of two nitrogen atoms ("N").

8. An "intermediate" is any one of the starting materials in a chemical reaction to make another compound.

9. B. Hesse, Coal-Tar Colors Used in Food Products 2–3, 25–30 (1912) (Exh. AZ). These same properties are the ones considered to be the essential desiderata today, *see* Food Colors Study, *supra* note 5, at 36–37.

10. Act of June 30, 1906, ch. 3915, 34 Stat. 768. In Food Inspection Decision 76, issued on July 13, 1907, the Federal Government listed the seven colors chosen by Hesse and provided that use of other dyes would be grounds for prosecution. Calvery, *Coal-Tar Colors: Their Use in Foods, Drugs & Cosmetics*, 114 Am.J. Pharmacology 1, 4–5 (1942) (Exh. BA) (quoting from F.I.D. 76).

11. The shorthand notations derive from the subsequent listing of these compounds by the FDA as "FD & C" ("Food, Drug & Cosmetic") Color Nos. 1, 2, and 3.

12. B. Hesse, *supra* note 9, at 11.

was developed by plaintiff Warner and added to the list in 1929.[13] At the same time, continued concern over the safety of food colors led to the passage of the Food, Drug and Cosmetic Act of 1938, which made certification mandatory and required toxicological data based on animal tests for continued or new listings of food colors.[14] As of 1951 there were nineteen coal-tar colors authorized for unrestricted food use, after public hearings required by the Act.

In the 1950s, however, the FDA, after conducting animal tests to reassess the toxicity of food colors, "delisted," or removed from the certified lists, no less than seven colors. Pursuant to the Color Additive Amendment of 1960,[15] the FDA in 1963 promulgated stringent and detailed regulations outlining the type of experimentation and other data to be submitted to establish grounds for permanent listing of food colors.[16] Concomitant with the FDA's heightened concern over toxicity, the red dye industry faced a "crisis" because of the delistment of Red 1 in 1960 (on the ground that it produced liver damage in test animals) and Red 4 in 1964 (on the ground of adverse pathological findings).[17] The delistments, which considerably narrowed the approved coal-tar additives, created an urgent need in the industry for a bright scarlet food color that could pass the FDA's ever more stringent toxicity tests *and* that had the vital "application properties" of a good food dye—useful shade and tinctorial strength, stability, solubility, suitability for blends, tastelessness and odorlessness.[18]

### B

Defendant Allied and plaintiffs Warner and Kohnstamm were in the early 1960s major manufacturers of food dyes, and red dyes constituted a large segment of their business. The crisis in red dyes produced an immediate reaction. In August or September 1964, Raymond Leary, Allied's Food Colors Product Manager, requested the Company's Analytical Laboratory to determine whether "any foreign food reds or any present as well as obsolete D&C or Ext. D&C colors might offer a suitable substitute" for Red 4.[19] The laboratory was unable to find such a substitute, and Leary turned to Allied's Research Department, specifically to Dr. Russell Steiner, a noted organic chemist with substantial theoretical and practical knowledge of coal-tar dye synthesis;[20] Steiner selected as his assistant

---

13. The structural formula for Red 4 is as follows:

The naphthol component for Red 4 is an "alpha-naphthol," not the "beta-naphthol" used in the prototype in the text at note 7 *supra.*

Alpha-Naphthol Beta-Naphthol

14. Act of June 25, 1938, ch. 675, 52 Stat. 1040, *codified at* 21 U.S.C. §§ 301–392. For the impact of the Act on the dye industry, see Calvery, *supra* note 10.

15. Pub.L. No. 86–618, tit. I, 74 Stat. 397 (1960), *codified at* 21 U.S.C. §§ 321, 331, 333, 342, 343, 346, 351, 361, 362, 371, 376.

16. 28 Fed.Reg. 6439 (June 23, 1962).

17. Red 4 was relisted in 1965 for the limited use of dyeing marashino cherries but in 1976 was delisted for all food use purposes.

18. *See* Exh. D (1965 Steiner request for research authorization: "Thus there is an urgent need for a bright yellowish-red to replace Reds # 1 and # 4."); Exh. EZ (December 1964 letter from Warner's Director of Sales: "Unfortunately there is no entirely satisfactory single replacement for FD & C Red No. 4.")

19. Exh. 501 (laboratory report evaluating various possibilities).

20. Dr. Steiner received his Ph.D. in organic chemistry in 1956. Since 1974, he has been on the Editorial Board of the *Colour Index,* a prestigious position held by few American chem-

Gustav Rast, a senior dye chemist. The object of their research, which extended over a period of two and one-half years, was to find a red food color dye that had a shade between that of Red 1 and Red 4, was nontoxic, and had the many specific application properties necessary for general food use.[21]

Upon synthesis and testing of existing compounds, Steiner and Rast in December 1964 realized that no existing food color would meet the need; a new dye would have to be invented. Prior to returning to the laboratory, Steiner and Rast discussed certain empirical criteria which they believed might bear on the toxicological acceptability of such compounds: the dye should (1) have water-solubilizing groups (such as sulfonic acid groups, $-SO_3$) on both sides of the azo linkage, (2) not contain exotic groups or be prepared from intermediates which were known carcinogens, (3) and substitute methoxy groups ($-OCH_3$) for methyl groups ($-CH_3$) wherever possible. These "guidelines" represented the state of the art of food dye chemistry in 1964 and early 1965 [22] and were, by and large, reaffirmed in a conference with Kelly Ferber of Allied Chemical's Production Department.[23] On the other hand, the history of FDA delistments through 1964 suggested that such criteria were not reliable in predicting nontoxicity; [24] so, too, it was all but impossible to predict most application properties of dye compounds based solely upon an analysis of their structures, except that sulfonic acid groups made a compound water soluble and methyl and methoxy groups shifted dye shade in a "bathochromic" (to-

ward bluer hues) direction. Accordingly, the researchers did not follow the guidelines dogmatically but, instead, synthesized a wide range of azo compounds, followed by further experimentation and comparison testing.

Steiner and Rast actually began synthesizing dyes in December 1964—first, existing dyes and, then, new ones that they hypothesized. Each dye was applied to a wool swatch for shade comparison with swatches dyed with Red 1 and Red 4; of the more than 90 colors synthesized, nine were found close enough in color to justify application testing in early 1965. One of the nine was a compound synthesized by Steiner and Rast in December; it was prepared by coupling para-cresidine monosulfonic acid (the phenyl intermediate) with Schaeffer's Salt (the naphthol intermediate):

This dye, later to be approved by the FDA as Red 40 and patented by Allied, was at first not considered a leading candidate to replace Red 1 and Red 4, because it had a methyl group, which was questionable on toxicity grounds; an initial application test (stability to sulfur dioxide) was disappointing; it did not have the exact shade desired; and there were potential difficulties in preparing the compound because para-cresidine monosulfonic acid was not available commercially.[25]

ists. His reputation in the dye chemist community was acknowledged by all witnesses.

**21.** Trial Record ("T.R.") 2122.

**22.** *See* T.R. 754–60 (testimony of Dr. Jack Radomski, plaintiffs' expert); *id.* 2158–59, 2179–80 (testimony of Dr. Steiner); Exhs. 102–104, 106 (scholarly articles); Exh. 505 (1965 Progress Report on Steiner & Rast research); Exh. 540 (1967 Allied memo); Exh. 603(6).

**23.** Exh. 503. *But cf.* T.R. 2163–67 (Steiner testimony that some of Ferber's suggestions were self-contradictory).

**24.** Thus dyes, including Red 1 and Red 4, that had been long accepted as nontoxic through the 1950s suddenly, in the 1960s, were subject to delistment as unsafe. Food dye chemists in the 1960s were, moreover, unsure as to the reasons some compounds, such as beta-naphthylamine, were toxic and others, such as the structurally similar alpha-naphthylamine, were not. *See* notes 79–80 *infra.*

**25.** *See* T.R. 2152–55, 2158–59, 2178–82 (testimony of Dr. Steiner); Exh. 603(6) (Rast memorandum, Jan. 7, 1965).

After synthesizing further dyes and conducting numerous application tests,[26] the researchers narrowed the list of promising candidates to five by July 1965, and Allied engaged Hazelton Laboratories ("Hazelton") to conduct toxicological tests on these "finalists." Upon reviewing Hazelton's results of short-term feeding of large doses of the dyes to dogs, Allied in December 1965 eliminated one of the five compounds from consideration. In February 1966 it sent Hazelton ten-pound samples of the remaining four finalists for six-week feeding tests with dogs and rats and commenced a new series of application tests. Two of the dyes were eliminated from consideration after the tests revealed liver and thyroid abnormalities in animals, leaving two potential dyes. For purposes of Allied's internal identification, the compounds were denoted as "Z–4576" and "Z–4578," the latter being a disazo compound.

During 1966 the Company subjected the two remaining candidates (Z–4576 and Z–4578) to side-by-side comparison tests with Red 4, including solubility in water, ethyl alcohol, and glycerine; stability as to heat, pH, acid, sugar, and sodium hydroxide; tinctorial strength as applied to sugar patties, milk tints, wool; the effect of metals on shade; and fastness and substantivity (resistence to "bleeding" off of the food). The "[c]onsensus was that Non-Toxic Red Z–4576 was superior in most properties and is most similar to the delisted FD & C Red # 4."[27] Accordingly, Z–4576 was selected for long-term toxicological testing by Hazelton, consisting mainly of feeding studies on rats and dogs, dermal application tests on rabbits and mice, and reproduction studies. In March 1970 Hazelton reported that the compound was entirely nontoxic, and on April 22 Allied petitioned the FDA for listing the color additive as suitable and safe for use in foods and drugs. The FDA listed the dye as FD & C No. 40 on April 10, 1971, based in part on animal studies conducted by the agency that established that the dye did not have the toxicity exhibited by Red 4. Indeed, the FDA's toxicologist found that "[t]he slight differences in structures of [Red 40] from that of FD & C Red No. 4 apparently are responsible for the difference in toxicity."[28]

### C

Because of its proven nontoxicity and superior application properties, Z–4576 was viewed as a desirable successor color to Red 4 and, therefore, a valuable project for Allied Chemical. To protect its heavy investment in the development and testing of the dye over an extended period, Allied took steps to obtain a patent, especially since those persons at Allied who were engaged in the project considered that the product had a good chance of being patented. As a result, an "invention record" was prepared by M.D. Edelman of Allied's Industrial Chemicals Division for "a novel monoazo dyestuff obtained by coupling diazolitized 3-methoxy-6-methyl sulfonic acid in alkaline media, into Schaeffer's Salt," to be used "as a satisfactory substitute for FD&C Red # 4" since it had analogous properties and was surprisingly more soluble in water than Red 4.[29] In his thorough search of American and foreign patent records, Edelman found that a German patent, D.R.P. 12,451, was, "perhaps, the most pertinent reference" to the prior art.

This German patent concerned "the preparation of red and violet azo dyes which are

**26.** These included tests with respect to solubility; tinctorial strength on various types of foodstuffs, including cherries and wieners; stability to sulfur dioxide, heat, pH changes, ascorbic acid. Exh. 513 (Progress Report of Steiner & Rast research, Aug. 1965).

**27.** Exh. 531 ¶ 4.3 (minutes of Allied Industrial Chemicals meeting Feb. 2, 1967). As indicated in a report by Dr. Steiner written in late 1966 or early 1967, Exh. AB, the researchers found Z–4576 to be substantially more soluble in water and glycerine than either of the other two dyes, stronger than Z–4578 in sugar platting tests, and considerably less inclined to "bleed" from cherries than Red 1, Red 4, or Z–4578. *See also* T.R. 2202–10 (testimony of Dr. Steiner).

**28.** Exh. FI, at 20.

**29.** Exh. 533 (invention record, Feb. 13, 1967).

formed by the reaction of diazoanisoles and their sulfonic acids with naphthols and their sulfonic acids."[30] Among the dozens of generic formulae disclosed in the patent is the one derived from combining the methyl ether of amino cresol sulfonic acid with beta-naphthol monosulfonic acid which theoretically would embrace Z–4576.[31] But Edelman concluded that since "[t]his art which was published in 1879, does not particularly identify the components" of the various generic formulae, and "no mention is made of their lack of toxicity and suitability for coloring edible substrate," it was no barrier to patentability.[32]

The invention record prepared by Edelman was forwarded to Dr. A. Victor Erkkila, the Chief Patent Liaison Officer of the Industrial Chemicals Division, in February 1967. Dr. Erkkila—who received his doctorate in physical chemistry from the Technical University in Stuttgart, Germany in 1935—studied the German patent and the other patented chemicals cited by Edelman's report. He, too, concluded that Z–4576 was not specifically disclosed in any of the references and that it was patentable.[33] Erkkila thereupon forwarded the invention record to Michael S. Jarocz, Patent Counsel for the laboratories of the National Aniline Division of Allied, who also studied the German Patent thoroughly. He felt that the "shotgun disclosure" of D.R.P. 12,451 could in "no possible way . . . be construed as disclosing Red 40 unless [by] resort[ing] to incredible hindsight."[34] In particular, he considered the unique properties of Z–4576—nontoxicity, surprisingly

high solubility, and other excellent application properties—to be the basis for patentability, and these were in no way disclosed by the arcane teutonic patent.

On May 18, 1967, Jarocz filed Allied's application with the United States Patent Office. The "Abstract of Disclosure" provided, in part, as follows:

> Monoazo compounds of this invention, which may be termed 1-([2-alkoxy-5-alkyl-4-sulfophenyl]azo)-2-naphthol-6-sulfonic acids and physiologically acceptable salts thereof are prepared by conventional procedures, e. g. coupling diazotized 5-alkoxy-2-alkylsulfanilic acid, in alkaline media, into 2-naphthol-6-sodium sulfonate. The monoazo compounds of the invention are useful as dyestuffs for various substrates and especially for edible substrates, such as foodstuffs or pharmaceutical compositions.
>
> This invention relates to the production of novel red monoazo dyestuffs. More particularly, the present invention is directed to highly soluble red monoazo dyestuffs and to their use as colorants, especially in dyeing of edible substrates.
>
> Certain red dyes have found use in the past in various coloring or dyeing applications, especially in the coloring of foodstuffs or other edible substrates. One such dyestuff (F.D. & C. Red No. 4) recently has been delisted for essentially all edible uses by the Food and Drug Administration, thereby creating a need for a red dye particularly useful in the coloring of edible substrates.

**30.** Exh. 10T.

**31.** Amino cresol is methyl-amino-benzene, and the term methyl ether denotes a methoxy radical. Thus the "methyl ether of amino cresol sulfonic acid," has the following formula,

CH₃O—[benzene ring with SO₃H at position 3, NH₂ at position 1, CH₃ at position 5]

One specific formula included in that generic formula is that of the phenyl component of Red 40: the methyl group is fixed in the # 5 posi-

tion, the sulfonic acid group in the # 4 position, and the methoxy group in the # 2 position (numbered counterclockwise from the azo linkage). Similarly, the naphthol component of Red 40 is one of the variations on the general formula denoted in "beta-naphthol monosulfonic acid," with the sulfonic acid group in the # 6 position on the naphthol ring (if numbered clockwise from the azo linkage).

**32.** Exh. 533 ¶ 6.3 (invention record).

**33.** See T.R. 1688–93 (testimony of Dr. Erkkila).

**34.** T.R. 1224–25.

**380**

Accordingly, one object of the present invention is to provide new and useful dye compositions.

A further object of the present invention is to provide highly soluble non-toxic monoazo dye compositions which are useful in the coloring of edible substrates.

Relying on his own prior experience as a Patent Examiner (1960 to 1964), Jarocz did not cite D.R.P. 12,451 as the most pertinent prior art because he believed, in good faith, that the German Patent was irrelevant and would only confuse the Examiner; as prior art, he cited Red 4:

(Red · 4)

(Red 40)

One year later, in May 1968, Allied filed applications for a "use" patent with the Dutch Patent Office and a "composition" patent with the German Patent Office, based on substantially the same claims.

On April 9, 1969, the American Patent Examiner made an initial determination rejecting the claims asserted in the application, primarily because the applicants did not sufficiently describe the utility of their invention and because a prior patent was structurally so similar that the invention was obvious to the ordinary dye chemist. The latter is the "Elley Patent": [35]

Allied petitioned for a reconsideration of the Examiner's decision on the ground that the invention's usefulness in coloring edible substrates and its surprising properties, in-

cluding nontoxicity and high solubility, justified patentability. The applicant also distinguished the Elley Patent as a red to bluish-red water-insoluble color useful for dyeing petroleum products, which had never been noted for food dye uses and was particularly unsuitable therefor because of its undesirable "bronzy fluorescence." These arguments were apparently persuasive to the Patent Office, since it granted the '617 patent on July 7, 1970, and the '733 patent on February 8, 1972.[36]

Allied also encountered problems in its foreign applications. Thus in 1973, Dr. Muhlbauer, the German Examiner, questioned "the existence of inventive level" because of the large number of red dyes of excellent solubility already on the market and requested the applicant to submit a more complete statement of the prior art. In response, Allied narrowed its application somewhat but defended the inventive contribution: "The *advance of the art* represented by the new dyestuffs results primarily from their lack of toxicity. . . . The *inventive level* of the object of the application results from the fact that dyes of similar structure . . . are toxic

---

**35.** United States Patent No. 2,224,904 (Dec. 17, 1940) ("Coloring of Petroleum Distillates") (Exh. 49).

**36.** Allied disclaimed the "terminal portion" of the '733 patent—the portion which would have extended beyond the expiration of the '617 patent—so that both patents will expire on the same date (July 6, 1987).

and/or have other undesired properties. . . . It is surprising that by such a slight change in the chemical structure the toxicity could be so strongly reduced."[37] Also included in the response was a list of "literature references," including citations to the Elley Patent, D.R.P. 12,451, the "Widmer Patent,"[38] and the "Baum Patent."[39] The German Examiner obtained and examined the references and concluded that none rendered Red 40 unpatentable. Hence, on October 11, 1974, the German Patent Office announced that Allied's application would be published for opposition; as no opposition was filed, the Office granted the patent on June 16, 1975.

Of all the authorities passing upon Allied Chemical's application, the most stringent scrutiny was carried out by the Dutch Patent Office, which in 1973 had been the first to mention, after its own search, the relevance of D.R.P. 12,451. Allied in 1975 narrowed its claims before the Dutch Office to embrace the use of the compounds only for dyeing foods, drugs, and beverages.[40] Although the Office found that a patentable invention did reside in the more circumscribed claim, it raised further questions to distinguish the use of Red 40 from that of D.R.P. 12,451 and other red dyes listed in the various indices. On November 30, 1978, the Application Department announced that the application was acceptable and would be published for opposition; no opposition has been received as of the date of

this opinion, with the prospect that the Dutch patent will issue in due course.

D

Allied began manufacture of Red 40 in 1971, at which time there was only one other major red food dye on the market, Red 2. Red 40 was an immediate and enormous commercial success: the dye certified by the FDA rose from 26,000 pounds in the third quarter of 1971 to an average in excess of 160,000 pounds per quarter in the years 1973 to 1975.[41]

Although Red 2 continued to hold a sizeable share of the market, the established nontoxicity (combined with FDA publicized doubts about the nontoxicity of Red 2), bright scarlet hue, surprisingly high solubility, and other application properties of Red 40 made it more than just a replacement for Red 4. For example, in 1973 Allied's development of Red 40 received "Top Honors" in the "Ingredients Category" of the Putman Food Awards, based on Red 40's novelty, breadth of application, and significance to the food color industry. This success, moreover, stimulated competitors to try to develop new red food dyes, though without result as of this date. Indeed, Warner, a plaintiff in this action, contracted with St. Louis University for research "to synthesize purified laboratory quantities of novel water-soluble dyes . . . for possible use as food colors"[42] and entered into a three-year

37. Exh. GE, at 42–43. In response to Examiner Muhlbauer's citation to many red dyes listed in the *Colour Index*, the letter stated that "none of the above-mentioned known red dyes is sufficiently suitable for use as a food dye. In particular none of these dyes has the combination of properties that it is nontoxic, stable to sulfur dioxide and of yellowish-red color. Some of them are furthermore precipitated by acid or not completely fast to light." *Id.* at 48–49. *See also* Exh. 575 (letter of Oct. 30, 1973 to German Patent Office).

38. United States Patent No. 2,606,184 (Aug. 5, 1952) ("Chromiferous Monoazo-Dyestuffs") (Exh. 51).

39. United States Patent No. 250,038 (Nov. 22, 1881) ("Manufacture of Crimson Coloring Matter") (Exh. 44) The Baum Patent is identical to Colour Index No. 16160.

40. Exh. GC, at 89 (new claim: "A method of coloring foods, beverages and pharmaceutical and cosmetic preparations as well as labels coming into contact with the same, characterized by the use as coloring substance of a compound of [claim 1 of the '617 patent] . . . .")

41. Exhs. DS & 405. Although plaintiffs contend that Red 40's success was entirely contingent on the misfortunes of Red 2, the Court's examination of the FDA's statistics persuades it that Red 40 had consumer appeal independent of the demand for Red 2.

42. Exh. EA ¶ 1 (agreement between Warner and University).

$3,000,000 contract with Dynapol Corporation for the latter to invent a new red dye using advanced polymer technology.[43]

Recognizing the utility of Red 40, and not having a suitable alternative at hand, Warner and Kohnstamm, after failing to obtain licenses from Allied, commenced manufacture of the dye. In 1972 they instituted the lawsuits, discussed above, to declare the patents invalid. Upon settlement of that litigation, plaintiffs entered into "License Agreements" with Allied, pursuant to which the licensees were to pay a royalty of 17½% on the "net sales price," or invoice price, of Red 40 sold and were precluded from terminating the Agreements at any time before the second anniversary of the licenses on March 1, 1977. However, before that date, on February 12, 1976, the FDA delisted Red 2, leaving Red 40 as the only significant red food color on the market; the immediate result was an increase in the sales (to an average of over 400,000 pounds per quarter for the years 1976 through 1978) and corresponding increases in the total royalties collected by Allied.

In June 1976, plaintiffs instituted this second action to declare the patents invalid or unenforceable and to recover royalty payments made under the License Agreements. Judge Marvin Frankel, to whom the case was assigned, dismissed the complaint on the ground that the License Agreements precluded suit before the termination of the two-year period, but the Court of Appeals reversed and remanded, holding that the two-year nontermination period did not bar the action.[44] Upon Judge Frankel's resignation from the Bench, the case was assigned to this Court and proceeded to trial.

**43.** T.R. 1099–1102, 1130, 1721–22, 1729–30.

**44.** *Warner-Jenkinson Co. v. Allied Chem. Corp.,* 567 F.2d 184, 187–88 (2d Cir. 1977).

**45.** Defendants' Brief after Trial, at 34.

**46.** 35 U.S.C. § 282; *Santa Fe-Pomeroy, Inc. v. P&Z Co.,* 569 F.2d 1084, 1091 (9th Cir. 1978).

**47.** *Champion Spark Plug Co. v. Gyromat Corp.,* 603 F.2d 361, at 366 n. 11 (2d Cir. 1979); *Georgia-Pacific Corp. v. United States Plywood*

## II

While contractual and other ancillary claims are advanced by both sides, the hard core of the case is whether the '617 and '733 patents are valid and enforceable. To determine these issues, the Court must assess, first, the inventive contribution made by Allied's red dye and, second, the substantial accuracy and completeness of disclosures made in its patent application and the use defendants have made of the patents in suit.

### A

■ Inventions that are useful, novel, and nonobvious are patentable. Plaintiffs contend that the patents in suit are invalid because they fail the latter two litmus tests for patentability. Defendants, on the other hand, argue, in the unadorned language of their counsel, that what Steiner and Rast did—"what lies at the heart of their inventive contribution"—was "to invent a novel and unobvious scarlet red food color—a specific monoazo dye (bearing particular substituents in precise locations) and one which possessed the myriad of unpredictable application and toxicological properties demanded of a safe, general use, food color."[45]

■ The Court's inquiry begins with the statutory "presumption of validity" of the patents granted by the Patent Office. Plaintiffs have the burden of proof to overcome the presumption by clear and convincing evidence, and every reasonable doubt should be decided in favor of the patents' validity.[46] The presumption is strongest where the Patent Office has granted the patent with knowledge of the prior art[47]

*Corp.,* 258 F.2d 124, 133 (2d Cir. 1958); *Dennison Mfg. Co. v. Ben Clements & Sons, Inc.,* 467 F.Supp. 391, 406–07 (S.D.N.Y.1979); *Lerner v. Child Guidance Prods., Inc.,* 406 F.Supp. 560, 563 (S.D.N.Y.1975), *aff'd,* 547 F.2d 29 (2d Cir. 1976); *cf. Merck & Co. v. Olin Mathieson Chem. Corp.,* 253 F.2d 156, 164 (4th Cir. 1958) (Haynsworth, J.) ("That presumption of validity, however, should not be disregarded especially in a case of this sort where the intricate questions of bio-chemistry involved are pecu-

—here, the Elley Patent, the Baum Patent, and FD & C Yellow No. 6 ("Yellow 6") were considered by the Patent Examiner, and plaintiffs' remaining citations to the prior art are largely cumulative.[48] On the other hand, the presumption does not apply to the issue of novelty, since plaintiffs' attack focuses on the German Patent—D.R.P. 12,451 —not considered by the Examiner. As to this claim, the burden rests upon defendants to establish de novo the validity of their patents.[49] Based on the recent intensive refresher course in *organic chemistry* afforded by the charts and written submissions prepared by the parties, its assessment of the credibility and study of the testimony of the expert witnesses presented by each side, and an exhaustive review of the record, the Court is persuaded that the patents are valid.

### 1

■■ An invention is "anticipated," and therefore not patentable because not novel, if "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent."[50] Anticipation is a narrow and technical attack on patentability; as a consequence, "[t]he standards of anticipation are strict. The invention must be disclosed within the four corners of a single reference."[51] In the case of chemical compounds, the mere recitation of a structural formula is insufficient to be an anticipation: the disclosure must also recite means of preparing the compound and at least one significant useful property.[52]

■ Plaintiffs argue that Claim 3 of D.R.P. 12,451 (the "German Patent") anticipates the patents in suit. Claim 3 reads: "The above described processes for the production of yellow and red dyes by action . . . of diazo anisole sulfonic acids from the anisoles named under [claims] 1 and 2 on naphthols, naphtol monosulfonic acids, and naphthol disulfonic acids." Claims 1 and 2 list no less than nine diazoanisole sulfonic acids; three separate naphthol sulfonic acids are possible. Claim 3 thus embraces over twenty-seven generic formulae, one of which is produced by the action of "methyl ether of amino cresol sulfonic acid on beta-naphthol monosulfonic acid." The structural formula for this product is[53]

liarly within the particular competence of the experts of the Patent Office.")

**48.** *See* note 74 *infra.*

**49.** *Cathodic Protection Serv. v. American Smelting & Refining Co.,* 594 F.2d 499, 505 (5th Cir. 1979); *Republic Indus., Inc. v. Schlage Lock Co.,* 592 F.2d 963, 972 (7th Cir. 1979) (even one prior art reference not considered by Patent Office may undermine presumption of validity); *Julie Research Laboratories, Inc. v. Guildline Instruments, Inc.,* 501 F.2d 1131 (2d Cir. 1974).

**50.** 35 U.S.C. § 102(a); *see id.* § 102(b).

**51.** *General Tire & Rubber Co. v. Firestone Tire & Rubber Co.,* 349 F.Supp. 345, 356 (N.D.Ohio 1972), *aff'd in relevant part,* 489 F.2d 1105 (6th Cir. 1973), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974) (citing cases); *accord, General Elec. Co. v. United States,* 572 F.2d 745, 768 (Ct.Cl.1978) ("To anticipate a claim, a prior art reference must show each and every element claimed."); *Tights, Inc. v. Acme-McCrary Corp.,* 541 F.2d 1047, 1056 (4th Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976); *Saf-Gard Prods., Inc. v. Service Parts, Inc.,* 532 F.2d 1266, 1270 (9th Cir.), *cert. denied,* 429 U.S. 896, 97 S.Ct. 258, 50 L.Ed.2d 179 (1976) (quoting and following *Stauffer v. Slenderella Sys. of Calif.,* 254 F.2d 127, 128 (9th Cir. 1957)); *Shanklin Corp. v. Springfield Photo Mount Co.,* 521 F.2d 609, 616–17 (1st Cir.), *cert. denied,* 424 U.S. 914, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1975); *In re Royka,* 490 F.2d 981, 984 (C.C.P.A.1974); *Shelco, Inc. v. Dow Chem. Co.,* 466 F.2d 613, 614 (7th Cir.), *cert. denied,* 409 U.S. 876, 93 S.Ct. 125, 34 L.Ed.2d 129 (1972) (quoting and following *Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc.,* 436 F.2d 1180, 1182–83 (7th Cir. 1971)); *Ling-Temco-Voght, Inc. v. Kollsman Instrument Corp.,* 372 F.2d 263, 267 (2d Cir. 1967) (Medina, J.).

**52.** *In re Samour,* 571 F.2d 559 (C.C.P.A.1978) (citing cases); *E. I. DuPont de Nemours & Co. v. Ladd,* 117 U.S.App.D.C. 246, 328 F.2d 547 (1964).

**53.** For the chemical explanation of this formula, see note 31 *supra.*

This structure theoretically embraces over 100 separate isomers [compounds having the same elemental composition (the same number of carbon, hydrogen, etc., atoms in the compound) but different structures], each having different properties. Plaintiffs' own expert conceded that the German Patent contained no description of Red 40 either in specific words or by specific structure, which in this instance was in accord with the views of defendants' experts. Accordingly, an initial response to plaintiffs' argument is that the German Patent does not disclose Red 40 with the requisite specificity; one would have to experiment with a large number of possible intermediates referred to in the German Patent and successfully piece together the necessary ones to come up with the one generic formula out of a total of twenty-seven generic for-

mulae and then would have to experiment further to discover the specific structure of Red 40. This is not anticipation.[54]

The argument, however, is more complex and relies on other references. Thus counsel for plaintiffs contend that (1) if "the description in the printed publication impart[s] to the person of ordinary skill sufficient information which, coupled with the disclosures of the prior art, would enable him to devise the invention without further genuine inspiration or undue experimentation," then the description anticipates the patented product,[55] and (2) the "person of ordinary skill" in the food dye industry would be aware of the editor's comment on D.R.P. 12,451 in the Friedlander edition of German patents and the *Colour Index* and would deduce from these references that a dyestuff having the same structural formula as Red 40 was the most natural disclosure of that patent. The "Friedlander Comment" reads in relevant part:[56]

*The aminophenol ethers stated in the patent to be used for the preparation of azo dyes came chiefly from ortho- and para-anisidine and their sulfonic acids, as well as amino cresol ether.* The ortho compound yields in combination with B-naphthol and its sulfonic acids, yield es-

54. *Cf. Rich Prods. Corp. v. Mitchell Foods, Inc.*, 357 F.2d 176, 180 (2d Cir. 1966); *Taussig v. Jack & Jill One Hour Cleaners, No. 12, Inc.*, 462 F.Supp. 1026, 1035–36 (N.D.Ohio 1978); *Technical Tape Corp. v. Minnesota Mining & Mfg. Co.*, 143 F.Supp. 429, 435–36 (S.D.N.Y.1956), *aff'd*, 247 F.2d 343 (2d Cir. 1957).

A similar argument was squarely rejected in *E. I. DuPont de Nemours & Co. v. Ladd*, 117 U.S.App.D.C. 246, 328 F.2d 547 (1964), which involved the patent for the chemical tetracyano-ethylene,

The validity of the patent was attacked as anticipated by the following patent,

"wherein $R_1$ and $R_2$ stand for a member of the group consisting of CN, acyl and an esterified carboxylic acid group,

$R_3$ stands for a member of the group consisting of hydrogen, CN, acyl and an esterified carboxylic acid group and

$R_4$ stands for a member of the group consisting of alkyl, oxalkyl, aryl, CN, acyl and an esterified carboxylic acid group."

The testimony at trial was to the effect that a trained expert would have chosen tetracyanoethylene as one of the most evident disclosures of that generic patent. Yet the Court held nonetheless that the earlier patent, "allowing as it did an infinite number of possibilities, would be minimally described as an 'implicit' publication of theoretical lists of hundreds or thousands of possible compounds; and thus would not be an appropriate anticipation of a later patent application for a specific compound." *Id.* at 553.

55. *Struthers Scientific & Int'l Corp. v. Rappl & Hoenig Co.*, 453 F.2d 250, 255 (2d Cir. 1971).

56. Exh. 11T, at 9 (emphasis added by plaintiffs' expert witness). The Friedlander edition was a leading collection of German patents earlier in this century; the editor reported various patents and then commented upon their most useful applications.

sentially yellower derivatives, as contrasted to the corresponding para compounds.

One prepared from o-anisidine and *Schaefer-B-napththol monosulfonic acid*, gives a scarlet red dye which falls under the designation "Anisole red"; one somewhat yellower from anisidine sulfonic acid and B-naphthol is known as "Ponceau 3G" (3J or Scarlet 3J) in the Trade.

In more detail, plaintiffs' argument runs thus: The German Patent describes scarlet red dyestuffs produced by the action of "diazoanisole sulfonic acids" on "beta-naphthol monosulfonic acid." A diazoanisole sulfonic acid described in the German Patent and highlighted in the Friedlander Comment is "methyl ether of amino cresol sulfonic acid," and the only "methyl ether of amino cresol sulphonic acid" shown in the 1956 edition of the *Colour Index* is ortho-toluene sulfonic acid, 4-amino-5-methoxy, which is the same intermediate used to make Z–4576. The argument continues: The only beta-naphthol monosulfonic acid mentioned in the Friedlander reference is Schaeffer's Salt, the same naphthol coupling intermediate used to make Z–4576. Thus plaintiffs by this three-reference process argue that one skilled in the art would have been led to and known of Red 40. While this convoluted argument appears to have a surface logic, in fact it is reconstructed, brilliant hindsight that is not convincing on the issue of anticipation.[57]

To begin with, given Judge Learned Hand's admonition that "a prior patent or other publication to be an anticipation must bear within its four corners adequate directions for the practice of the patent invalidated," the Court is dubious of the legal accuracy of step one in the general argument.[58] But even if the anticipatory reference could be pieced together from several sources as suggested by plaintiffs, the Court finds that the patents in suit would not have been disclosed to a cognizant artisan in the field of dye chemistry in 1964.

One is led to inquire if, as plaintiffs contend, the German Patent together with the Friedlander Comment so obviously describes Red 40, why Warner did not come across it in 1929 when it sought and created a new scarlet red food color—the now delisted Red 4. Common sense, not altogether irrelevant even in patent cases, generates doubts that a relatively obscure one-hundred year old foreign patent, which only indirectly discloses the composition of Red 40 and does not clearly disclose its properties, describes the compound to a dye chemist skilled in the art in 1965.[59] This common sense view is confirmed by the reliable expert testimony in this case. Thus Dr. Erkkila, a highly experienced dye chemist, testified upon his deposition that although the German Patent theoretically embraced Red 40, it was not even a pertinent prior art

**57.** *See General Tire & Rubber Co. v. Firestone Tire & Rubber Co.*, 349 F.Supp. 345, 356 (N.D. Ohio 1972), *aff'd in relevant part*, 489 F.2d 1105 (6th Cir. 1973), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974) ("An anticipating reference must teach the invention; it is not sufficient to point to its silence or ambiguity after the invention and argue that the invention could be made out from the reference. . . . A patented combination cannot be anticipated piecemeal by finding individual features separately in the prior art.")

**58.** *Dewey & Almy Chem. Co. v. Mimex Co.*, 124 F.2d 986, 989 (2d Cir. 1942); *see* cases cited in notes 51 & 54 *supra*. The portion of the *Struthers* opinion quoted by plaintiffs, *see* text as note 55 *supra*, cites only one case in support of the proposition, *In re Palmquist*, 319 F.2d 547, 51 CCPA 839 (1963), a case analyzing standards of "obviousness" under 35 U.S.C. § 103, not "anticipation" under *id.* § 102.

*Palmquist*, moreover, has been overruled by the Court of Customs & Patent Appeals, *see In re Foster*, 343 F.2d 980, 989 (Cust. & Pat.App. 1965), and no court in this or other circuits has ever cited or followed the *Struthers* case. Plaintiffs' citation to *In re Samour*, 571 F.2d 559, 52 CCPA 1808 (1978), is inapposite, for that case involved publication of a precise structural formula, and the Court found the patent anticipated even though one would have to turn to a second source for a method of preparing the disclosed structure. *See In re Marshall*, 578 F.2d 301, 304 (Cust. & Pat.App. 1978).

**59.** *Cf. Imhaeuser v. Buerk*, 101 U.S. 647, 660, 25 L.Ed. 945 (1880) (patented combination cannot be anticipated piecemeal); *Duplan Corp. v. Deering Milliken, Inc.*, 444 F.Supp. 648, 708 (D.S.C.1977).

reference because Red 40 was only one of several hundred compounds described. "If a person had to devise a molecule which had these [food color] properties, even if he knew about the German patent," it was the view of Dr. Erkkila that the patent would in no way "lead him to that at all. It was such a broad disclosure. This is something like telling you that there is oil in Texas, but you go, and find where it is. . . . The German patent did not specifically disclose it and its teaching was so broad that it would encompass hundreds, if not, who knows how many, possible structures."[60]

Dr. Kenneth Freeman, an analytical food color chemist who, after many years service with the FDA, was the Director of its Division of Color Certification and Evaluation, testified that within the "generic terminology" of D.R.P. 12,451 are included "several thousand dyes." More important, Dr. Freeman, who impressed the Court with his knowledge of dye chemistry and his candor, stated that he found *no* specific description of Red 40 in the German patent, as read with the Friedlander Comment. Dr. Freeman's parsing of the language of the Comment as it would be read by a dye chemist rebuts the testimony of plaintiffs' expert witness, Dr. Bernard Rottschaefer, that the Comment describes Red 40 with particularity. Thus he pointed out that the Friedlander Comment mentions Schaeffer's Salt only as a coupler with ortho-anisidine and anisidine sulfonic acid, both of which lack methyl groups, and nowhere does Friedlander suggest Red 40's phenyl component, the closest reference being amino cresol ether, without any mention of its sulfonic acids, which Dr. Freeman interpreted as excluding the amino cresol ether sulfonic acid

component of Red 40.[61] Moreover, he testified that there is no indication that Friedlander meant to key the reader to a combination of Schaeffer's Salt in the second paragraph and the phenyl components listed in the first paragraph of the Comment, nor would a dye chemist so interpret.

Defendants' contention that the ordinary dye chemist would be confused, rather than enlightened, by the German Patent is supported too by incidents involving plaintiffs' own expert Dr. Rottschaefer. His declarations about the clarity of the German Patent's disclosures were delivered with an air of result-oriented assurance, and so it is not without significance that despite Dr. Rottschaefer's intense study of the patent, he too was sometimes confounded by its broadside mode of disclosure. For example, when he was asked to circle sections of the German Patent that defined the two moieties of Red 40, and after a recess to afford him the opportunity to reflect, Dr. Rottschaefer circled the wrong sections. Later, he erred in stating that Claim 2, not Claim 3, of the patent embraces the patents in suit.[62] The Court would find itself strained to accept plaintiffs' theory that D.R.P. 12,451 discloses the structure of Red 40 when their own expert is so easily tripped up in its circuitous maze.

A final factor supports the Court's judgment that the D.R.P. 12,451 does not anticipate Red 40. The German and Dutch Patent Offices had the German Patent before them when they allowed the Red 40 patents to be published for opposition. Trial evidence abundantly establishes that both offices are strict in enforcing the rule that anticipation by prior patent or publication precludes patentability,[63] and the issue of

60. T.R. 1688–89.

61. *Id.* 1561:

A . . . . Then the final part of the sentence [in paragraph one of the Friedlander Comment] appears to me to exclude the aminocresol ether sulfonic acids.
Q And on what do you base that conclusion, that latter conclusion?
A Well, because in the first portion he is talking about the ortho- and para-anisidine and their sulfonic acids but in the next

phrase, he just mentions aminocresol ether without any reference at all to their sulfonic acids.

62. *See* T.R. 448–51, 113, 1558–59, 2229–2300; *cf.* Exh. 11T, at 4 (copy of German Patent on which Dr. Rottschaefer circled wrong portion).

63. *See* T.R. 1958–60 (expert testimony of Delvalle Goldsmith, international patent attorney) (Dutch standards of novelty are, if anything, stricter than those in America); *id.* 1967–68 (German standards of novelty similar to those

anticipation was directly considered by each. Indeed, in a lengthy letter to the German Office, Allied raised the same argument it now presses before the Court, that "[i]t would require informed hindsight to select the single relevant structural formula . . . from the 40 to 60 broad and generalized structural formulae of the German patent." [64] While the decisions of the two foreign patent offices "are in no way controlling upon this court, . . . they are valuable as opinions of trained experts in the country of the inventor and where the art is best understood. The opinions of such men, learned, able and disinterested, officially expressed after thorough examination, are persuasive to say the least." [65] Their expert judgment is considered probative since it is recognized that in applying standards of novelty and nonobviousness, the patent offices of "Germany and Holland are among the strictest in the world," on a par with, if not superior to, the American office.[66] They found no anticipation by D.R.P. 12,451; this Court finds none.

2

The Court next considers plaintiffs' contention that the subject matter of the claims was obvious to a dye chemist of ordinary skill in 1964–68. An invention is "obvious," and therefore not patentable, "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." [67] Though the "test laid down is indeed misty enough," [68] the Supreme Court has given direction by setting forth "primary factors" always relevant to an inquiry into obviousness—"the scope and content of the prior art," "differences between the prior art and the claims at issue," and "the level of ordinary skill in the pertinent art"—as well as certain secondary considerations—"commercial success, long felt but unsolved needs, failure of others, etc."—that "might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." [69]

Because "the enormous number of known organic compounds gives rise to a situation in which absolutely unique and unknown

---

in United States and applied at least as strictly). See also American Infra-Red Radiant Co. v. Lambert Indus., Inc., 360 F.2d 977, 991–94 (8th Cir. 1966), cert. denied, 385 U.S. 920, 87 S.Ct. 233, 17 L.Ed.2d 144 (1966).

64. Exh. 575, at 5.

65. Badische Anilin & Soda Fabrik v. Kalle, 94 F. 163, 176 (S.D.N.Y.1899) (Coxe, J.), aff'd, 104 F. 802 (2d Cir. 1900) (relying on decision of German Patent Office); see American Infra-Red Radiant Co. v. Lambert Indus., Inc., 360 F.2d 977, 987 (8th Cir. 1966), cert. denied, 385 U.S. 920, 87 S.Ct. 233, 17 L.Ed.2d 144 (1966); Faraday, Inc. v. Audio Devices, Inc., 165 U.S. P.Q. 634, 637 (S.D.N.Y.1970).

66. T.R. 1660. Thus the Court finds Timely Prods. Corp. v. Arron, 523 F.2d 288, 295–96 (2d Cir. 1975), relied upon heavily by plaintiffs, to be distinguishable. There, Judge Conner upheld the exclusion of evidence of foreign patent grants, since there was no evidentiary basis to indicate that similar standards were applied to patentability in the foreign offices relied upon by appellant: "the standards of patentability vary widely from country to country; some countries, including France, one of the nine countries here, have only what amounts to a registration system with no examination given as to novelty, much less to level of ingenuity." Id. at 295.

67. 35 U.S.C. § 103.

68. Reiner v. I. Leon Co., 285 F.2d 501, 503–04 (2d Cir. 1960) (L. Hand, J.), cert. denied, 366 U.S. 939, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961).

69. Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966); see Dann v. Johnston, 425 U.S. 219, 226–30, 96 S.Ct. 1393, 47 L.Ed.2d 692 (1976); Eltra Corp. v. Basic, Inc., 599 F.2d 745 (6th Cir. 1979); Cathodic Protection Serv. v. American Smelting & Refining Co., 594 F.2d 499, 505–07 (5th Cir. 1979) (reviewing Supreme Court cases); Digitronics Corp. v. New York Racing Ass'n, 553 F.2d 740, 745 (2d Cir.), cert. denied, 434 U.S. 860, 98 S.Ct. 187, 54 L.Ed.2d 133 (1977) ("the court must look, in light of both the training of the patentee and the elements in the claimed invention which give it its novel quality, at what arts the patentee could reasonably be expected to consult in doing the inventing").

groupings of atoms in a completely new chemical compound is a rare occurrence," courts have generally held that such compounds are patentable even though similar compounds or isomers are well-known in the field. "Obvious molecular modification coupled with a showing of novel properties or superiority [over] known properties can establish patentability." [70] Since Judge Rich's celebrated decision of *In re Papesch*,[71] courts have been moving to a test of "essential predictability," balancing the significance of unexpected properties resulting from minor chemical manipulations of existing compounds against the desirable properties that would be expected from such alterations.[72]

At trial, plaintiffs mounted a technically powerful case in support of their claim that any one of several well-known dyestuffs could, with certain minimal changes, be transformed into Red 40 and that a dye chemist of ordinary skill would have known to make those alterations to achieve the desirable properties of Red 40. It may be accepted that a dye chemist in 1965 would have been aware of the appropriate literature and the main patents on which plaintiffs rely: the Elley Patent, which covers a compound which is reddish to bluish-red in shade; the Widmer Patent, a deep or bluish-red hue; the Baum Patent, a cherry red tint; and Yellow 6, a reddish-yellow (or yellowish-orange) color. Plaintiffs are also correct that such a chemist would have been familiar with certain molecular modifications and their effects on properties: sulfonation is highly desirable because it increases solubility in water and may decrease dangers of toxicity, and methyl and methoxy groups will shift the shade of the dye in a bathochromic direction, though for toxicity purposes methoxy groups should be preferred over methyl ones. According to plaintiffs' theory, a few simple changes in existing dyes, checked by routine experimentation in a laboratory available to our hypothetical chemist,[73] would yield a non-toxic scarlet red color having the structure of Red 40.

Thus plaintiffs stress that by merely adding sulfonic acid groups to the Elley Patent,

**70.** *Commissioner of Patents v. Deutsche Gold-und-Silber Scheideanstalt Vormals Roessler*, 130 U.S.App.D.C. 95, 100, 397 F.2d 656, 661 (1968) (Burger, J.) (footnotes omitted).

**71.** 315 F.2d 281, 50 CCPA 1084 (1963) (courts have determined the nonobviousness and patentability of new chemical compounds by taking into consideration their biological or pharmacological properties).

**72.** The test of essential predictability has been developed primarily in the Court of Customs & Patent Appeals, *see In re May*, 574 F.2d 1082, 1092, 50 CCPA 913 (1978); *In re Wilder*, 563 F.2d 457, 460 (C.C.P.A.1977); *In re Albrecht*, 514 F.2d 1389 (Cust. & Pat.App.1975); *In re Hoch*, 428 F.2d 1341, 57 CCPA 1929 (1970), but has also been favorably received by several circuit courts analyzing patentability of chemical compositions. *See Eli Lilly & Co. v. Generix Drug Sales, Inc.*, 460 F.2d 1096, 1101 (5th Cir. 1972); *Commissioner of Patents v. Deutsche Gold-und-Silber Scheideanstalt Vormals Roessler*, 130 U.S.App.D.C. 95, 100, 397 F.2d 656, 661 (1968) (Burger, J.); Note, *Standards of Obviousness & the Patentability of Chemical Compounds*, 87 Harv.L.Rev. 607

(1974); *cf. General Tire & Rubber Co. v. Jefferson Chem. Co.*, 497 F.2d 1283, 1287–88 (2d Cir. 1974) (Friendly, J.), *cert. denied*, 419 U.S. 968, 95 S.Ct. 232, 42 L.Ed.2d 184 (1974) (reserving question but citing Harvard Law Review Note with approval). Two district courts have expressed reservations with the Court of Patent Appeals' approach, but their judgments have been affirmed on other grounds in decisions citing and discussing *Papesch* with approval. *See Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.*, 341 F.Supp. 1303 (E.D.N.Y.), *aff'd sub nom. Carter-Wallace, Inc. v. Otte*, 474 F.2d 529, 540 (2d Cir. 1972) (Friendly, J.), *cert. denied*, 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973); *Monsanto Co. v. Rohm & Haas Co.*, 312 F.Supp. 778 (E.D.Pa.1971), *aff'd*, 456 F.2d 592, 599–600 (3d Cir.), *cert. denied*, 407 U.S. 934, 92 S.Ct. 2463, 32 L.Ed.2d 817 (1972).

**73.** *Cf. Indiana General Corp. v. Krystinel Corp.*, 421 F.2d 1023, 1030–31 (2d Cir. 1970), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970) (Medina, J.) (routine degree of experimentation is part of ordinary skill in the art).

Red 40 Elley Patent

or shifting one sulfonic acid group of the Baum Patent from the naphthol to the phenyl component,

Red 40 Baum Patent

Red 40's structure would be created and that these manipulations would have been obvious to a dye chemist who wanted a nontoxic water soluble red dye because addition of sulfonic acid groups guarantees water solubility and reduces risks of toxicity. As to the Widmer Patent, the only shift would be to replace a methoxy group with a methyl one,

Red 40 Widmer Patent

And Yellow 6 is claimed to render the patents in suit obvious since the addition of methyl and methoxy groups would shift its shade from reddish yellow to a deeper shade of red,

Red 40 Yellow 6

Thus by these simple changes plaintiffs argue that a dye chemist in 1965, after consultation with one skilled in the toxicology of food colors, would know that a food color should be monoazo and sulfonated on both sides, and that change from methyl to methoxy auxochrome groups reduced toxicity—all of which would lead him to the structure of a scarlet red food color.

Again, plaintiff's logical step-by-step argument relies on retrospective brilliance. Yet their analysis does not satisfactorily explain why the United States Patent Office, whose own careful search embraced the Elley and Baum Patents and Yellow 6, nonetheless granted the patents in suit.[74] Nor does it explain how these structural similarities failed to prevent the German and Dutch Patent Offices from giving their imprimatur, after an even more searching scrutiny of the prior art. The conclusion is warranted that, relying on the case law progeny of *Papesch,* these offices found the structural changes to be nonobvious ones in the light of Red 40's surprising and unexpected properties—proven and unquestioned nontoxicity, very high water solubility, and excellent application properties.

Indeed the state of the art in 1965 indicates that the molecular manipulations suggested by plaintiffs were not necessarily the most obvious ones to make in order to produce a nontoxic scarlet food dye. Thus the Elley Patent "relates to the production of colored gasolines and petroleum distillates, such as motor fuels, which are reddish to bluish-red in shade, have a bronzy fluorescence and are stable to the action of sunlight."[75] From the point of view of a food dye chemist in 1965, any variation of this compound would appear undesirable, since the patent not only suggests gasoline and other petroleum uses, but the "bronzy fluorescence" property would be highly undesirable in a food color; the Elley Patent would, if anything, "lead away" from the structure of Red 40 as a potential food dye. Even if the patent were itself more inviting, the direction of the prior art would not result in Red 40. Based on the nontoxicity principles that sulfonation is desirable and methoxy groups should substitute for methyl groups, the "obvious" alterations would be to replace the methyl group in Elley's phenyl moiety with a methoxy group and then experiment with different arrangements of sulfonic acid groups. This would tend, also, to lead away from Red 40.

The Baum Patent, differing from the patents in suit only in the placement of a

74. It is clear from his initial rejection that the Examiner had carefully examined the Elley Patent; that he also considered Yellow 6 and the Baum Patent is apparent from his "Searched" notation, which embraced portions of the *Colour Index* that included Yellow 6 (C.I. 15985) and the Baum Patent (C.I. 16160). The thoroughness of the Examiner's search is attested to by the fact that he noted an error in the 1956 edition of the *Colour Index,* upon which Allied had relied, that had been corrected in the 1963 Supplement.

75. Exh. 49.

sulfonic acid group, is a dye "which will give to wool and silk a deep crimson shade."[76] The *Colour Index* indicates that the Baum dyestuff is "cherry red," arguably the same hue as Red 4, the desired shade in the Steiner and Rast search. But neither reference mentions any use of the dye to color food. More importantly, to maximize the probability of nontoxicity based on the state of the art in 1965, the obvious manipulations would be to add one or more sulfonic groups to the left-hand moiety, without subtracting one from the right-hand moiety, and to strike the methyl group on the right-hand side. Again, the established principles of the art in 1965 would not have led the dye chemist ineluctably to Red 40. In addition, the credible expert evidence establishes that adding or shifting the position of sulfonate substituents would have a definite but unpredictable effect on the color of the resulting dye. Thus the manipulation suggested by plaintiffs (shifting the position) *or* that suggested by the prior art (adding a third group) would likely yield an unacceptable shade.

Likewise, the Widmer Patent describing "complex chromium compounds of monoazo dyestuffs" for wool and other fibers, appears entirely inapposite to the 1965 search for a nontoxic food dye.[77] Moreover, the state of the art would militate against substituting a methyl for a methoxy group (which would be necessary to lead the chemist to Red 40), since such substitution would increase risks of toxicity, rather than reduce them.

From the perspective of a food dye chemist in 1965, and not from the wisdom bred of hindsight, the most relevant prior art on which plaintiffs rely is Yellow 6, which was extensively used as a water-soluble food color. An initial problem with reliance on

Yellow 6, however, is that there was in 1965 some concern that it, like Red 4 and Red 1, might run into toxicity problems with the FDA.[78] Such a concern, even though it has proven unfounded in retrospect, would not have made Yellow 6 the obvious starting point for synthesizing a safe red dye. To the contrary, the uncertainty in the industry growing out of the FDA's numerous delistings in the late 1950s and early 1960s and the prospect of future delistings of existing colors, well-known in the trade and to food dye chemists, justifies the approach taken by Steiner and Rast—to seek out new structures and make their choice based on extensive chemical and pharmacological experimentation. Indeed, the approach pressed by plaintiffs—making structural manipulations in the myriad reddish dyes whose nontoxicity was far from established under the crisis circumstances in 1965— would not have been the prudent, or obvious, means of discovering a safe food dye such as Red 40.

Moreover, if the chemist did start with Yellow 6, the obvious changes he would make would be to add one, two, or three methoxy groups to the left-hand moiety to shift the shade in a bathochromic direction; the prior art would lead away from the structure of Red 40 because of the belief prevailing in 1965 that methoxy groups were preferred over methyl ones. The fact is that in 1965 dye chemists had scarce and unreliable information upon which to make predictions about toxicity. Many of their basic assumptions, in fact, have been cast into doubt. For example, the view that substituting methoxy groups for methyl groups as a way to reduce the risk of toxicity, accepted by dye chemists and toxicologists in 1964 and 1965, was severely questioned by an article published in 1965–66 by

---

76. Exh. 44.

77. Exh. 51.

78. Thus in public memorandum of December 14, 1964, the very time when Steiner and Rast were conducting their early experiments, Warner's Director of Sales stated that seven-year

dog studies were in progress to evaluate Red 2 and Yellow 6. Though the report to Warner's customers was understandably optimistic, it does indicate at least a temporary FDA cloud over these two colors, one of which was later delisted. Exh. EZ.

Dr. Jack Radomski, one of plaintiffs' own expert witnesses.[79] Similarly, the assumed wisdom that azo dyes that were bilaterally sulfonated would be nontoxic[80] is undermined by the delisting of Red 2, which has the following structure:

HO — SO$_3$Na ; NaO$_3$S — N=N — ; SO$_3$Na

The Court finds that the state of the art in 1965 was such that nontoxicity was essentially not predictable in an azo dye compound. Nontoxicity would only be established by trial and error and animal testing, which is precisely what Allied engaged in over an extended period.

Not only was Red 40's nontoxicity essentially unpredictable, but so too were its excellent application properties. While plaintiffs vigorously contend that Red 40 is quite an ordinary dyestuff having few qualities to recommend it other than its monopoly of the market, their position is belied by the testimony and documentation produced by one of their own witnesses, Dr. Samuel Zuckerman, the Vice-President of plaintiff Kohnstamm and General Manager of its Color Division. In a pamphlet on food colors published by the National Academy of Sciences and verified by Dr. Zuckerman as a reliable source on the subject, is a table of "Physical and Chemical Properties of Certified Food Colors," which yields the following information: [81]

| Properties | Red 40 | Red 2 | Yellow 6 |
|---|---|---|---|
| Stability to | | | |
| Light | very good | moderate | moderate |
| Oxidation | fair | fair | fair |
| pH change | good | good | good |
| | | | |
| Compatibility with Food Components | very good | good | moderate |

**79.** T.R. at 755 (testimony of Dr. Radomski):

Q At any time in the past was it thought that methoxy groups were less toxic, the methoxy groups on the phenyl moiety, were less toxic than methyl groups?

A Yes. It was thought that when FD & C Red No. 32 was found to be toxic and cathartic, a substitute dye, Citrus Red No. 2, was developed.

Citrus Red No. 2 is exactly the same dye as Red 32 except it has two methoxy groups on it instead of two methyl groups.

And when this dye was first developed and in the initial testing it seemed to be less toxic than Red 32. However, certain long term testing, which is the most critical thing, showed it to be a very toxic and acid substance.

**80.** The accepted view in the science of dye chemistry in the 1950s was "that all water-soluble sulphonated azo colourings should be free from carcinogenic activity," a view that was undermined when Red 1 and Red 4 proved to have toxic effects. In its place a new hypothe-

sis took form: "It may be that sulphonation on both sides of the azo linkage reduces the chance of carcinogenic effect by permitting more rapid elimination of the metabolites formed by the reductive cleavage of the monoazo colourings." Mannell, *Further Investigations on Production of Liver Tumours in Rats by Ponceau 3R*, 2 Food Cosmetics Toxicology 169, 173 (1964) (Exh. 107); *see* Daniel, *The Excretion & Metabolism of Edible Food Colors*, 4 Toxicology & Applied Pharmacology 572, 589–90 (1962) (Exh. 106) (indicating uncertain state of art); Radomski & Deichmann, *Cathartic Action & Metabolism of Certain Coal Tar Food Dyes*, 118 J. Pharmacology & Experimental Therapeudics 322, 327 (1956) (Exh. 103) ("[C]atharsis seems to be associated with derivation from beta-naphthylamine or alpha- or beta-naphthol. Sulfonation of the naphthalene ring destroys the cathartic properties.")

**81.** Food Colors Study, *supra* note 5, at 38 (Table 16).

| Properties | Red 40 | Red 2 | Yellow 6 |
|---|---|---|---|
| Tinctorial strength | very good | good | good |
| Solubility (g/100 ml) | | | |
| Water | 25 | 20 | 19 |
| EtOH | 9.5 | 7 | 10 |
| Glycerin | 3 | 18 | 20 |
| Overall Rating | good | moderate | moderate |

Plaintiffs have offered no evidence to refute the information in this chart, nor any explanation why in 1965 a dye chemist would have expected such superior application properties for Red 40. Indeed, plaintiffs' expert, Dr. Rottschaefer, acknowledged that, except for shade and solubility, he "wouldn't have enough knowledge from their structures to predict . . . at least on a tentative basis, the relative chemical properties" of Red 40 and Yellow 6.[82] In general, plaintiffs' argument with respect to the Elley, Widmer, and Baum Patents and Yellow 6, that with slight manipulation those with ordinary skill in the art of color research would have known of Red 40, utterly ignores an item of prime consideration in the search for a food dye—its application properties. Although they do refer to toxicity, water solubility, and shade, they ignore these other essential matters.

Even if the Court were to accept plaintiffs' position that the general shade of Red 40 was moderately predictable, with routine experimentation, its important application properties and nontoxicity were not. The patents in suit clearly meet the standards for patentability, since the essential unpredictability of the most important properties negates the claim of obviousness. This conclusion is bolstered by the various secondary considerations noted by the Supreme Court, which can tip the scales in favor of patentability in cases where the issue is closer than in the instant case.[83] Red 40 was developed to fill the serious void created by the delistment of Red 4; on filling this void, it has been a phenomenal commercial success; although in some measure it is due to the delisting of Red 2 in 1976, Red 40's success independent of the demise of Red 2 cannot be disputed.[84] The compound has also been acclaimed by the industry, winning the Putman Food Award for its inventive contribution. Warner itself paid tribute to Allied for its "bravado" in paying *all* the expenses for the pharmacology and testing for the development of Red 40 and thereby "scooping the rest of the industry." [85] Most compelling is the fact that despite plaintiffs' confident assertions that a safe red dye could easily be derived by performing certain simple manipulations on the structure of Yellow 6 (adding methoxy radicals), no such dyestuff has been forthcoming despite their concentrated efforts to develop a safe substitute red food color, and the leaders in the industry have tacitly acknowledged the

82. T.R. 610–11.

83. *See United States v. Adams,* 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966); *Photo Electronics Corp. v. England,* 581 F.2d 772, 781–82 (9th Cir. 1978) (secondary considerations especially helpful where evidence is highly technical); *Dennison Mfg. Co. v. Ben Clements & Sons, Inc.,* 467 F.Supp. 391, 416–19 (S.D.N.Y. 1979) (examining commercial success, failure of others, industry recognition as important factors supporting patentability); *cf. Safety Car Heating & Lighting Co. v. General Elec. Co.,* 155 F.2d 937, 939 (2d Cir. 1946) (L. Hand, J.).

84. *See* note 41 *supra.*

85. Exh. EM.

uniqueness of Red 40 by entering into licensing agreements with Allied.

**B**

The Court's finding that the patents in suit were not anticipated or obvious at the time of the invention does not end the inquiry, for plaintiffs argue that the patents are invalid or unenforceable on policy grounds, because of (1) Allied's failure to disclose pertinent prior art and the best mode of preparation in prosecuting its application before the Patent Office and (2) defendants' misuse of the "patent monopoly" to extort unreasonable sums from plaintiffs or drive them out of the dye market. The Court finds their claims to be without substance.

**1**

■■■ The first set of collateral attacks on the validity or enforceability of the patents is that Allied Chemical failed to disclose material matters in prosecuting its application before the Patent Office: (a) the "best mode" for preparing the dyes and (b) the most relevant prior art. While stopping short of alleging fraud on the Patent Office, plaintiffs contend that where nondisclosures are serious, material, and reckless the subsequently granted patents should be declared invalid or, at least, unenforceable.[86] The Court shares this concern. Because a patent grants a monopoly, and because the Patent Office, flooded with applications and at times lacking adequate resources, is unable to check all facts and investigate all relevant prior art, "it must rely on applicants for many of the facts upon which its decisions are based. The

highest standards of honesty and candor on the part of applicants in presenting such facts to the office are thus necessary elements in a working patent system."[87] Accordingly, "unclean hands" occasioned by failure to disclose such facts can operate to invalidate a patent or render it unenforceable.[88] Although Allied's disclosures were not all-inclusive, the Court finds that they were presented in good faith and without reckless disregard of the applicant's duties of disclosure.

■■ The first challenge is that Allied failed to meet the statutory requirement that "[t]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."[89] Plaintiffs do not dispute that the Red 40 specification clearly and accurately describes a mode that will yield the compound but charges that it is not the "best mode" because it omits an "alcohol-wash" purification step that is necessary to produce a batch with the 85% dye purity mandated by the FDA. As a result, the argument goes, the inventive contribution of the patent is insufficiently revealed to the public.

Defendants, acknowledging that "[a] patentee must disclose the best method known to him to carry out the invention," contend that "[i]t is enough that [the applicant] act

---

86. A declaration of "unenforceability" of the patents in suit would not prejudice defendants' ability to reapply to the Patent Office and acquire a new patent; a declaration of invalidity would preclude reapplication. *Cf. Timely Prods. Co. v. Arron,* 523 F.2d 288, 297–98 (2d Cir. 1975) (distinguishing between two terms but questioning practical difference).

87. *Norton v. Curtiss,* 433 F.2d 779, 793–94, 57 CCPA 1384 (1970).

88. *See True Temper Corp. v. CF & I Steel Corp.,* 601 F.2d 495 (10th Cir. 1979); *Union Carbide Corp. v. Borg-Warner Corp.,* 550 F.2d

355, 363 n.8 (6th Cir. 1977); *Turzillo v. P&Z Mergentime,* 174 U.S.App.D.C. 318, 532 F.2d 1393 (1976), *cert. denied,* 429 U.S. 897, 97 S.Ct. 260, 50 L.Ed.2d 181 (1977); *Frantz Mfg. Co. v. Phenix Mfg. Co.,* 457 F.2d 314, 325 (7th Cir. 1972); *cf. Kingsland v. Dorsey,* 338 U.S. 318, 319, 70 S.Ct. 123, 124, 94 L.Ed. 123 (1949) ("By reason of the nature of an application for patent, the relationship of attorneys to the Patent Office requires the highest degree of candor and good faith. . . .")

89. 35 U.S.C. § 112.

in good faith in his patent disclosure."[90] Although Allied did act in good faith, such a finding does not conclude the matter when the disclosure is so generalized or unhelpful so as to withhold effective use of the patented discovery from the public; the more recent case law sternly counsels that "[u]nintentional obtuseness or obfuscation might be a reason not to penalize someone; we do not see it as a reason for granting a seventeen year monopoly."[91] The proper test is the one indicated by the words of the statute: would a person skilled in the art be able, with a reasonable effort, to synthesize the patented compound?

While it appears that there were several possible means of increasing dye purity, the evidence before the Court conclusively establishes that the ordinary dye chemist would automatically know to use the alcohol-wash step to guarantee the requisite purity. This fact was dramatically demonstrated on defendants' examination of chemists employed by the two plaintiff companies. Fred Hope, a chemist at Kohnstamm, testified that he had no difficulty preparing Red 40 and used the alcohol-wash technique to increase the purity; he stated that the procedure was "something that almost any organic chemist should know."[92] More important, Richard Falk, Warner's Manager of Color Production, conclusively testified that a chemist of ordinary skill in the manufacture of food colors could pick up the Red 40 patents, read the disclosed method of preparation, and have no problem in preparing the product with the degree of purity required for FDA certification.[93] Although it would have been better to have included the alcohol-wash step in the patent's specification, its omission was neither reckless nor uniformed, but rather based on the correct perception that dye chemists would utilize the method in any event.

■ Plaintiffs' second challenge is that Allied's failure to cite D.R.P. 12,451 and Yellow 6 to the Patent Office as relevant prior art constitutes unclean hands that should equitably estop it from enforcing its patents.[94] Courts have agreed that where "misrepresentations [are] made in an atmosphere of gross negligence as to their truth," patents thereby procured will not be enforced, even where there is no finding that the withheld material would have caused the Patent Office to deny the application.[95] "Public interest demands that all facts relevant to such matters be submitted formally or informally to the Patent Office, which can then pass upon the sufficiency of the evidence":[96] the applicant has a duty to disclose matters that are relevant.

Though the Court is persuaded that Allied and its agents did not act in bad faith

**90.** *Benger Laboratories Ltd. v. R.K. Laros Co.*, 209 F.Supp. 639, 644 (E.D.Pa.1962), *aff'd per curiam*, 317 F.2d 455 (3d Cir.), *cert. denied*, 375 U.S. 833, 84 S.Ct. 69, 11 L.Ed.2d 64 (1963); *accord, Illinois Tool Works, Inc. v. Solo Cup Co.*, 179 U.S.P.Q. 322, 366–69 (N.D.Ill.1973).

**91.** *Dale Electronics, Inc. v. R.C.L. Electronics, Inc.*, 488 F.2d 382, 389 (1st Cir. 1973); *accord, Union Carbide Corp. v. Borg-Warner Corp.*, 550 F.2d 355, 363 (6th Cir. 1977); *Frantz Mfg. Co. v. Phenix Mfg. Co.*, 457 F.2d 314, 325 (7th Cir. 1972).

**92.** T.R. 1915; *see id.* 1912–14; Exh. NA.

**93.** T.R. 2071–72.

**94.** Plaintiffs appear to have abandoned their claim that Allied misrepresented the "surprisingly high solubility" of Red 40 in its application. Indeed, the credible evidence introduced at trial fully supported Allied's claims. *See* Exh. BB, at 38 (table reproduced in text at note 81 *supra* ).

**95.** *Norton v. Curtiss*, 433 F.2d 779, 796 (C.C.P. A.1970); *accord, True Temper Corp. v. CF & I Steel Corp.*, 601 F.2d 495 (10th Cir. 1979); *Turzillo v. P&Z Mergentime*, 174 U.S.App.D.C. 318, 325, 532 F.2d 1393, 1400 (1976), *cert. denied*, 429 U.S. 897, 97 S.Ct. 260, 50 L.Ed.2d 181 (1977); *Monsanto Co. v. Rohm & Haas Co.*, 456 F.2d 592, 597–600 (3d Cir. 1972), *cert. denied*, 407 U.S. 934, 92 S.Ct. 2463, 32 L.Ed.2d 817 (1973); *Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.*, 443 F.2d 867, 881 (2d Cir. 1971) (Friendly, J.), *cert. denied*, 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973); *Beckman Instruments, Inc. v. Chemtronics, Inc.*, 428 F.2d 555, 565 (5th Cir.), *cert. denied*, 400 U.S. 956, 91 S.Ct. 353, 27 L.Ed.2d 264 (1970).

**96.** *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945).

in failing to make these disclosures and there was no purpose to deceive, the issue remains as to whether Allied acted with a reckless disregard of its duty of full disclosure. Defendant's disclosure in its application was, arguably, self-serving, since the only citation to prior art was to Red 4, which was unlikely to render the patents in suit obvious in the light of applicant's representation that Red 4 "recently has been delisted for essentially all edible uses by the Food and Drug Administration, thereby creating a need for a red dye particularly useful in the coloring of edible substrates." But its failure to disclose Yellow 6 was not wrongful conduct, since there is no evidence that anyone associated with the patent application—attorney Jarocz, expert Erkkila, inventor Steiner, or researcher Edelman— found Yellow 6 relevant to patentability.

The issue is sharper with respect to the failure to disclose D.R.P. 12,451. It is clear that "[i]f an applicant knows of prior art which plainly describes his claimed invention or comes so close that a reasonable man would say that the invention was not original but had been anticipated, he will not be excused for failure to disclose his knowledge." [97] And Edelman's invention record listed the German Patent as "perhaps, the most pertinent reference." Nonetheless, the Court is persuaded that Allied's failure to disclose was not purposeful or designed to mislead nor did it constitute gross or reckless disregard of its duty of disclosure.

From an objective perspective, of course, Jarocz's judgment was the correct one, since this Court, and both the German and Dutch Patent Offices, carefully considered D.R.P. 12,451 in affirming the novelty of the Red 40 patents. And the judgment of Jarocz, a former Patent Examiner, that the antiquated German Patent might prove confusing was not without substance. His decision not to cite the patent came only after much study and discussion with others more knowledgeable than he, primarily Dr. Erkkila, whose characterization of D.R.P. 12,451 as an impossibly broad generic disclosure is probative. In sum, even assuming that the German Patent would have been pertinent in the proceedings before the United States Patent Office, Allied was reasonably diligent and not reckless in not citing the German Patent as prior art or as a possible anticipation.[98]

### 2

■ Plaintiffs' further argument is that defendants have misused their patents (a) by charging an exorbitant royalty rate that has allegedly priced Kohnstamm out of the market and is oppressive to Warner and (b) by applying the rate to the "testing surcharge" that since December 1976 has been included in the invoice price of food colors sold by both plaintiffs.[99] Plaintiffs' charge that the 17½% rate is exorbitant, rests upon two events that took place after the parties had agreed upon the royalty rate: the delisting of Red 2 in February 1976 gave defendants a unique monopoly position by in effect closing the market to all other red food colors, and in December 1976 industry members agreed to share among themselves the expense of a testing program. As a result, it is urged that the patents are unenforceable and that defendants are engaged in unfair competition.

With respect to the broader charge that the 17½% rate constituted patent misuse, the legal authorities on which plaintiffs rely in no way support their far-fetched position. The main cases cited by plaintiffs support the proposition that "conditioning the grant of a patent license upon payment

**97.** *True Temper Corp. v. CF & I Steel Corp.*, 601 F.2d 495 (10th Cir. 1979).

**98.** Cf. *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965) ("honest mistake as to the effect of prior [art] on patentability" will not strip patentee of its patent); *Xerox Corp. v. Dennison Mfg. Co.*, 322 F.Supp. 963, 968–69 (S.D.N.Y.1971) (applicant justified in relying on reasonable and good faith judg-ment "in deciding what matters are and are not of sufficient relevance and materiality to require disclosure").

**99.** Plaintiffs, defendants, and other members of the industry agreed, with the approval of the FDA, to share among themselves the cost of a temporary program of toxicological testing for FD & C colors. Exh. 202.

of royalties on products which do not use the teaching of the patent does amount to patent misuse."[100] There is no such tie-in product in this case. Instead, the facts of the case fall squarely under the equally established principle that "[a] patent empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly,"[101] and rates well in excess of the 17½% charged here have been upheld against charges of patent misuse.[102]

Plaintiffs' position is further undermined, if not conclusively rebutted, by the fact that the 17½% rate was the result of bargaining among giants in the food dye industry. Of the six leading food color manufacturers four—the two plaintiff companies, the Hilton-Davis Chemical Company, and defendant Buffalo Color—manufacture and sell Red 40; the first three are licensed at the 17½% rate, pursuant to agreements freely negotiated and entered.[103] Plaintiffs engaged in arm's length bargaining with Allied over a four-month period, after the first trial was underway. One of the bargained-for provisions of the License Agreement was the royalty of 17½% of the invoice price charged to customers; if plaintiffs were dissatisfied with the provision, they were under no compulsion to accept the contract—the door of the courthouse was open for them to continue the trial and seek a final determination of the validity of the patents, and if successful they would have been free of any royalty payment. Their choice to agree to the 17½% rate binds them now.

The fact that the delisting of Red 2, almost a year after the parties agreed upon the royalty rate, had made Red 40 the only major red food color on the market, is no ground upon which to charge defendants with patent misuse. This was a result of the action of the FDA, which acted under a public duty to guard against potentially harmful food components. This action by an official agency did not convert the previously agreed upon royalty rate into an exorbitant or coercive rate. More important, the likely delisting of Red 2 was known to plaintiffs, as it was to the entire industry, almost four years before entry into the Licensing Agreements. Finally, it is not without significance that Hilton-Davis entered into its licensing agreement, containing the same 17½% royalty provision, after the FDA's action in February 1976.

Plaintiffs make the further claim that Kohnstamm was forced to give up the manufacture of Red 40 because the royalty rate was too high. The fact is that Kohnstamm manufactured and sold Red 40 under its license from March 1975 to November 1978 and paid almost $500,000 in royalties. Kohnstamm's decision not to manufacture Red 40 was a calculated business judgment based on its view that it was more profitable to concentrate on and expand production of another dye, Red 3, in which it had a strong market position and to buy Red 40 rather than to make it under the royalty license. Moreover, Kohnstamm's claim that the royalty rate forced it to discontinue the manufacture of Red 40 is seriously undermined by a study specifically undertaken by its cost accountant to evaluate whether it was cheaper to buy Red 40 at prevailing market prices or to manufacture it under

---

100. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 135, 89 S.Ct. 1562, 1582–1583, 23 L.Ed.2d 129 (1969); *see Morton Salt Co. v. G. S. Suppiger Co.*, 314 U.S. 488, 493, 62 S.Ct. 402, 86 L.Ed. 363 (1942); *Glen Mfg., Inc. v. Perfect Fit Indus.*, 420 F.2d 319 (2d Cir. 1970); *Duplan Corp. v. Deering Milliken, Inc.*, 444 F.Supp. 648, 693–705 (D.S.C.1977).

101. *Brulotte v. Thys Co.*, 379 U.S. 29, 33, 85 S.Ct. 176, 179, 13 L.Ed.2d 99 (1964).

102. *E. g., W. L. Gore & Assocs., Inc. v. Carlisle Co.*, 529 F.2d 614, 623 (3d Cir. 1976) (30% royalty); *Georgia-Pacific Corp. v. United States*

*Plywood-Champion Papers, Inc.*, 446 F.2d 295 (2d Cir. 1971) (22% royalty).

103. The record does not disclose any objection of Hilton-Davis to the royalty payments, though it has paid approximately $1,500,000 in royalties over the last three years. There is trial testimony that Hilton-Davis, invited by plaintiffs to join in this action, declined to do so and that its counsel was of the view that the Red 40 patents were valid and would be infringed if the dye were manufactured without a license. T.R. 1068–69. In addition, to secure the license Hilton-Davis paid Allied $100,000.

the License Agreement from Allied at the 17½% royalty rate. The cost accountant's conclusion based upon a study and analysis of significant factors was that it was more profitable to manufacture Red 40 even after the royalty payment than to purchase the product in the market. However, Kohnstamm's executives decided otherwise. But whatever influenced their decision it was a deliberate business judgment. The claim here advanced that Kohnstamm was foreclosed from the market because of the royalty rate borders on the frivolous.

Any suggestion that the rate of royalty is excessive or excludes competitors from the market is also negated by the continued viability of Warner, Kohnstamm's co-plaintiff in this action, and Hilton-Davis as competitors in the Red 40 market which includes Buffalo Color. The evidence establishes that Warner has made a profit on its sale and manufacture of the patented item, on which it has paid (through February 1979) royalties of $2,500,000. Hilton-Davis, from the time it was licensed through February 1979, has paid almost $1,500,000 in royalties. Plaintiffs' contention that because of the ban on Red 2 and the increased sales of Red 40 with the consequent dollar increase in royalty payments the stipulated 17½% royalty rate thereby became "economically oppressive, unreasonable and excessively high," stands economics on its head.

With respect to the further claim that the royalty is unfairly applied to the testing surcharge, plaintiffs' argument is equally weak. The License Agreements expressly pegged the 17½% rate to the "invoice price at which Licensed Food Color was sold by Licensee," for the business convenience of the parties.[104] The plaintiffs' decision not to absorb but to pass on the surcharge to their customers by including it in their billings of Red 40 should not deprive defendants of their claimed right to receive royalties based upon the billings.[105] Defendants' calculation of the royalty from the full invoice price, including the surcharge, is based upon an assertion of their right to receive 17½% as royalty as defined in the agreement.[106] Accordingly, the Court holds that defendants have engaged in no unfair business conduct constituting misuse of their patents, unfair competition, or violation of the antitrust laws, since defendants' royalties are fully justified under the terms of the Licensing Agreements, which were fully negotiated and entered into without coercion.

■ The Court next considers defendants' counterclaims of infringement of the patents and breach of contract of the settlement agreements. These are somewhat interrelated. If the settlement agreements under which the plaintiffs pay the 17½% royalty are in effect, then defendants' claim of infringement must fail since plaintiffs have paid the royalty from the time the agreements were made to the present and thus are authorized licensees. Thus the primary thrust of the breach of contract claim is that plaintiffs' commencement of this action within fifteen months after the first action had been settled, in the face of a provision in the agreement that the "licensee [plaintiffs] shall have the right to terminate this agreement at any time after the second anniversary thereof," violated the agreement. The defendants contend that the two-year provision was a period of mandatory "repose" from litigation and that the commencement of this suit prior thereto was a material breach which terminated the agreement; as a consequence, defendants assert that plaintiffs no longer were licensees and their continued manufacture of Red 40 makes them infringers. While defendants' desire for a period of repose is understandable, the simple fact is that the

---

**104.** Exh. Ch. ¶ ¶ 1.6, 3.1(a).

**105.** T.R. 1105–07. Defendant Buffalo Color does not include the testing charge in its invoice price; on its sales of Red 40, it invoices the "temporary testing surcharge" as a separate invoice item.

**106.** Plaintiffs were free to challenge defendants' interpretation by a separate declaratory judgment suit but failed to institute any such action. (T.R. 1119).

settlement agreements do not contain any specific provision that plaintiffs shall not commence another litigation in less than two years—a provision which by itself may present a question of its enforceability in the light of *Lear Inc. v. Adkins*.[107]

But, more important, the matter appears to have been put at rest by the decision of the Court of Appeals in this very case, where the basis of the defendants' motion to dismiss this action is the alleged breach here advanced to support defendants' claim. The majority of the Court, based in large measure upon the underlying rationale of *Lear* of the public interest in challenges to alleged invalid patent monopolies, held that "[t]he plaintiffs should not be barred from declaratory relief simply because the licensing agreement is not terminable by the licensee for two years" and that "a two-year moratorium on litigation is not implicit in every two-year nontermination provision."[108] Thus the commencement of this action before the two-year period did not constitute a breach of the parties' agreement, and since plaintiffs admittedly are current in meeting the royalty payments under the License Agreements, there is no basis for the infringement claim.

One final matter remains to be decided. Defendants, the prevailing party in this lawsuit, strongly urge the Court to grant it counsel fees for its defense of this action. They argue that this is an "exceptional case" in which courts are empowered to grant such fees because of what they term are "extraordinary circumstances" surrounding the case, to wit:[109] plaintiffs "slavishly" copied the patented item before instituting their first action in this Court, disregarded the period of repose of the Licensing Agreements when they commenced this second action attacking defendants' patents, attempted to avoid payment of royalties during the litigation by petitioning the Court to place all such funds in an escrow account, and stubbornly persisted in their contention that unlicensed manufacture of Red 40 would not infringe the patents in suit, even if they were held to be valid.

■ The Court concurs that, depending upon one's point of view, this case has been "exceptional," in that it has arisen out of "extraordinary circumstances." There is no doubt that both parties have engaged in extensive and burdensome litigation and that each has incurred very substantial legal and other expenses in the course of the two sharply contested lawsuits. But this has been of their own choosing. Each had the opportunity for a binding judicial determination of their respective claims four years ago when the first case actually proceeded to trial. The parties opted instead for a settlement which their very experienced lawyers knew would not conclusively and finally resolve their controversy. Plaintiffs, instead of pressing their claims of invalidity, noninfringement, and unenforceability of the patents, preferred to pay the agreed-upon royalty with a right of termination after a two-year period.

Defendant Allied had a similar opportunity to present its counterclaim for infringement for judicial and binding determination but decided to settle for the royalty payments to it plus a payment of $200,000. Moreover, Allied could have cut off the prospect of a second lawsuit by insistence upon a consent decree of validity and infringement of its patents (plaintiffs refused to enter into such a decree), failing which it was still free to continue the still-pending trial and secure an adjudication of its counterclaim upon the merits which would have had res judicata force.[110] That renewal of litigation was a distinct likelihood, whether

**107.** 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1967).

**108.** *Warner-Jenkinson Co. v. Allied Chemical Corp.*, 567 F.2d 184, 188 (2d Cir. 1977).

**109.** 35 U.S.C. § 285; *see Kahn v. Dynamics Corp. of Am.*, 508 F.2d 939, 945 (2d Cir. 1974), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975); *Louis Marx & Co. v. Buddy L Corp.*, 453 F.Supp. 392, 398 (S.D.N.Y.1978).

**110.** *Wallace Clark & Co. v. Acheson Indus.*, 394 F.Supp. 393, 399–400 (S.D.N.Y.1975), *aff'd*, 532 F.2d 846 (2d Cir.), *cert. denied*, 425 U.S. 976, 96 S.Ct. 2177, 48 L.Ed.2d 800 (1976); *Addressograph-Multigraph Corp. v. Cooper*, 156 F.2d 483 (2d Cir. 1946).

openly stated or not, is evident from the order of dismissal *without prejudice* of plaintiffs' claims in the first action. Thus each party, defendants no less than plaintiffs, shares the responsibility for this second action with its consequent burdens and expenses. Indeed, each is at fault for involving the Courts a second time with their hard-fought controversy when it could have been resolved in the first action. While settlement of actions is to be encouraged, those which are but a temporary truce in the parties' continued warfare and present only the facade but not the reality of settlement should not be encouraged. Such maneuvering does not create the "exceptional case" warranting the allowance of counsel fees. Each litigant will bear its own fees.

In sum, judgment may be entered dismissing upon the merits plaintiffs' claims of invalidity, noninfringement and unenforceability of the patents and their other claims; dismissing upon the merits defendants' counterclaims of breach of contract and infringement and denying defendants' application for attorneys' fees.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

So ordered.